In re Nancy Sue **PUCKETT**, Barbara Guess Hampton, Ruby Waller, Milton R. Harlan, Vinnie Vinson, Debtors,

**CONSUMER LEASE NETWORK, INC.** and Waterbed World, Inc., Movants,

v.

Nancy Sue **PUCKETT**, Barbara Guess Hampton, Ruby Waller, Milton R. Harlan, Vinnie Vinson and Henry E. Hildebrand, III, Trustee, Respondents.

Bankruptcy Nos. 385–01792, 385–02105, 385–02106, 385–02497 and 385–02396.

United States Bankruptcy Court, M.D. Tennessee.

April 18, 1986.

Edgar Rothschild, III, Nashville, Tenn., for Nancy Puckett.

James Flexer, Nashville, Tenn., for Milton Harlan.

Richard Dance, Nashville, Tenn., for CLN.

Paul J. Morrow, Jr., Nashville, Tenn., for Vinnie Vinson.

Michael Combs, Nashville, Tenn., for Ruby Waller and Barbara Hampton.

Henry E. Hildebrand, III, Nashville, Tenn., Chapter 13 Trustee.

Jimmie Lynn Ramsuar, Nashville, Tenn., for Waterbed World, Inc.

## MEMORANDUM

KEITH M. LUNDIN, Bankruptcy Judge.

The issue in these consolidated proceedings is whether agreements are true leases or disguised sales and security interests. I find that the agreements are security agreements and the transactions are sales not leases.

The following constitute findings of fact and conclusions of law. Bankruptcy Rule 7052. This is a core proceeding. 28 U.S. C.S. § 157(b)(2)(M) (Law.Co-op.1986).

### I. PROCEDURE

Consumer Lease Network ("CLN") has moved to compel these Chapter 13 debtors to accept or reject "leases" and CLN objects to confirmation of each debtor's plan. CLN asserts the plans do not cure defaults and fail to provide adequate assurances of future payments—conditions imposed by 11

U.S.C.S. § 365(b) (Law.Co-op.1986) if a debtor is to assume a lease or executory contract that is in default. Each proceeding presents the same controlling issue: whether the agreements between the debtors and CLN are leases or security agreements.

The court also heard testimony in *Waterbed World, Inc. v. Puckett,* Case No. 385–01792, involving the same sale versus lease question. Waterbed World, using CLN's printed form, but without CLN's participation, consummated two transactions with Nancy Sue Puckett. These transactions are the subject of motions substantially similar to those filed in *CLN v. Puckett.* [1]

## II. THE CLN TRANSACTIONS

Each debtor signed an agreement with CLN entitled "Lease Agreement and Consumer Leasing Disclosure Statement." [2] Paragraph 1 provides that "CLN leases to Lessee and Lessee leases from CLN, the property hereinafter described ..." Each

agreement is for a term of 18 months. Payments are due monthly. The agreement allows the "lessee," with CLN's approval, to defer any monthly installment by paying a deferral charge. The "lessee" pays sales tax, provides insurance, performs all maintenance and indemnifies CLN in various ways. The "lessees" may terminate the arrangement by returning the collateral to CLN[3] or exercising an option to purchase.[4] Upon termination, the "lessees" are liable to CLN for all matured monthly payments, late charges, deferral and insurance charges and any damage to the property.

CLN disclaims all warranties but assigns manufacturers' warranties to the "lessee". It does not carry liability insurance for any damages which may be caused by the goods. CLN does not file U.C.C.–1 financing statements.

CLN operates in Tennessee and three or four other states.[5] It does business with approximately 300 retail dealers. It has six employees, all located in Nashville. CLN enters into 1,700 to 1,800 "lease

---

1. After trial, Nancy Sue Puckett and Ruby Waller voluntarily dismissed their Chapter 13 cases. CLN then filed a motion in each case requesting "that the rental installment under the lease agreement[s] ... be administrative expenses of the estate and paid by the Trustee out of the funds which he has on hand and before disbursing any of said funds to anyone else." At oral argument, the parties stipulated that the lease versus security agreement question was not moot in *Puckett* or *Waller* but remained integral to the administrative expense claims of CLN.

2. Thomas P. Anderson, president of CLN ("Anderson"), testified that the same form has been used by CLN since its inception with minor modifications. A representative agreement is attached as Appendix A.

3. Paragraph 12(a) provides:
   Lessee may terminate this lease before the end of the lease term upon the following conditions: Upon notice to CLN and delivery and surrendering to CLN the property in as good a condition as Lessee received same, less ordinary wear and tear. The charge for such early termination is the payment of all the lease payments and late payment charges which have matured prior to delivery of said property to CLN and paying for all damage to said property other than the ordinary wear and tear, and all return premiums from any

insurance which Lessor obtains for Lessee as authorized herein.

4. Paragraph 14 provides:
   OPTION TO PURCHASE: Lessee has an option to purchase the property at any time during the lease term at an option price computed as of the monthly payment due date following the date of purchase. Before the option can be exercised to purchase the property at the option price, Lessee must pay all matured monthly payments and late payment charges in full. If the right to purchase is exercised at the end of the term, the option price shall be $_____. If the right to purchase is elected prior to the end of the lease term, the option price on the date of execution hereof shall be $_____ (original option price) and on each monthly payment due date hereafter, said original option price shall decrease by the sum of $_____. Any monthly payment which has been deferred, must be paid in full prior to the property being purchased. Option price includes sales tax.

5. At trial, Anderson testified that CLN operates in four states: Mississippi, Arizona, Oklahoma and Louisiana. Testimony of Thomas P. Anderson Sept. 26, 1985 Transcript at 132. At his deposition, he testified that the four states were Tennessee, Oklahoma, Arizona and Louisiana. Anderson, Deposition at 6, 43.

agreements" per year. It currently maintains 2,700 to 2,800 open accounts. Since its inception, CLN has administered approximately 5,000 contracts.

Each debtor testified credibly and without substantial contradiction concerning the transactions with CLN.[6]

## A. VINSON

Vinnie and John Vinson[7] contracted with CLN on November 16, 1983. The transaction was arranged by the John F. Lawhon Furniture Company. The Vinsons went to the Lawhon store on November 15, 1983 intending to purchase furniture. They were attracted by a sale advertisement. A Lawhon salesman assisted in the selection of furniture, then introduced the debtors to another Lawhon employee who handled financing. The debtor told the credit person she had no credit cards and only two lines of credit in Nashville. He told the debtor "there was other ways [they] could get approved." Testimony of Vinnie Vinson, Sept. 26, 1985, Transcript at 183. This "other way" to "get approved" was not described. They were simply told that "they have [sic] other ways of line of credit that we could buy our furniture." Id. at 184. The Vinsons filled out an application form[8] and left a $200 deposit. .

The following day, the Vinsons were notified by phone that their application had been approved and they could pick up the furniture. The Vinsons returned to the Lawhon store and signed a CLN contract. Ms. Vinson testified that when she saw the contract she wanted to make sure that her money was going toward buying the furniture. A Lawhon employee reassured her that she was purchasing the furniture. He explained "something about so much going towards this and so much for going toward buying it. And at the end of that time the amount left over paid in cash." Id. at 186–87.

Approximately 12 months later, Ms. Vinson became unable to make the monthly payment. She telephoned CLN and told

---

**6.** CLN, relying on the parol evidence rule, argued that the agreement proclaims itself to be a lease thus any evidence tending to rebut that proclamation is inadmissible.

The parol evidence rule may be stated as follows:

" When a contract has been reduced to writing, in plain and unambiguous terms, without any uncertainty as to the object or undertaking of the parties, it is conclusively presumed that the whole engagement of the parties and the extent and manner of their undertaking, was embraced in [the] written contract.

*Bedford v. Flowers*, 30 Tenn. 242 (1850). *See also Faulkner v. Ramsey*, 178 Tenn. 370, 272–77, 158 S.W.2d 710, 711–12 (1942) ("Extrinsic evidence which tends to aid, confirm or explain a writing rather than alter it, or which assists the court in understanding and interpreting the language of the writing" is not excluded by the parole evidence rule); *Kreis v. Venture Out in America, Inc.*, 375 F.Supp. 482, 484 (E.D.Tenn. 1973).

The terms of this contract are not unambiguous. Although the writing calls itself a lease, the issue is whether the parties intended to create a lease or a security interest. The legal effect of the transaction is in issue here, not what the parties chose to call it. A court is not bound by the labels used by the parties. *See Chuck Hutton Leasing Co. v. Rose*, Shelby Law No. 57, slip op. (Tenn.Ct.App. Sept. 12, 1984); *Jahn v. M.W. Kellogg Co. (In re Celeryvale Trans-*

*port, Inc.)*, 44 B.R. 1007 (Bankr.E.D.Tenn.1984); *In re Polaris Industries, Inc.*, 14 U.C.C.REP. SERV. 182 (CALLAGHAN) (Bankr.E.D.Tenn. 1973). *See also Mejia v. Citizens & Southern Bank*, 175 GA.APP. 80, 332 S.E.2d 170 (1985) ("In determining the real character of a contract, courts always look to its purpose, rather than the name given by the parties."); *Barclays American/Leasing, Inc. v. Holder & Northern Lumber Co.*, No. 381–0300 slip op. (Bankr.M.D. Tenn. Apr. 8, 1982) (North Carolina law); *Steel v. Gebetsberger (In re Fashion Optical, LTD.)*, 653 F.2d 1385 (10th Cir.1981) (*paraphrasing* W. Shakespeare, *Romeo and Juliet*, act II, sc. 2, 1.43 (1596)). Furthermore, courts are required by statute to take into account all of the facts and circumstances surrounding a transaction to determine whether it was intended to create a security interest. TENN.CODE ANN. § 47–1–201(37) (Michie 1979).

**7.** The debtor and her husband have since separated. John Vinson is not a party to this proceeding.

**8.** It is not clear whether the Vinsons filled out a CLN application or some other credit application which the Lawhon employee copied onto the CLN application. The CLN application is very similar to a credit application with the exception that six personal references are requested. A CLN "lease application" is attached as Appendix B.

them to pick up the furniture. She was informed that instead of returning the furniture she could pay a deferral charge until she was able to make the regular payments. Ms. Vinson paid between $32 and $35 per month to defer payments for approximately four months,[9] then again fell behind. She spoke again to CLN and was told by a Mr. Allen that she could further defer payment for $28. She made one $28 payment in June of 1985.

## B. HARLAN

Milton R. Harlan contracted with CLN on June 13, 1985. The transaction was arranged by Catalina Waterbed ("Catalina"). Harlan was attracted to Catalina by a radio advertisement offering "free" satin sheets, two king size pillow cases, a mattress pad and a comforter with the purchase of a waterbed. Harlan selected a waterbed and told the Catalina salesperson that he would buy the bed if he could obtain credit. He filled out a credit application. The next day Harlan called the store and was told that his credit application had been rejected but that he should "just come on in anyway and there was a way he could fix it where I could purchase this bed." Testimony of Milton R. Harlan, Sept. 27, 1985, Transcript at 8.

Harlan returned to the store, signed a CLN agreement and gave Catalina the down payment. Harlan testified that he did not read the contract before he signed it, he had never dealt with a lease company before and he was led to believe that he was buying the bed by the amount of the down payment and the monthly payments and the fact that he subsequently received a payment book. Id. at 9, 17.

## C. HAMPTON

Barbara Hampton contracted with CLN on October 27, 1984. The transaction was arranged through Wonderful Waterbeds. On her first visit to Wonderful Waterbeds, she chose a waterbed and filled out a credit application. An employee of Wonderful Waterbeds later informed her that the credit application had been rejected but that "there was this new plan and that I qualified for it. It would make my credit better." Testimony of Barbara Hampton, Sept. 27, 1985, Transcript at 51.

Hampton returned to the store, made a deposit and signed the CLN agreement. She did not read it nor was she told about the final purchase payment. Hampton testified she believed she was buying the bed. She became aware of the option price when she received her payment book in the mail and noticed a balloon payment of $308 on the last page. Id. at 54. She phoned Wonderful Waterbeds and asked for an explanation. She was informed that when the time came she could pay the final option by continuing the regular monthly installments. Id. at 54–55. Hampton learned of her right to terminate the contract sometime later "when me and my husband separated, I got a phone call that left a message at my mom's house and that's when my mother told me then that I could just turn it back in. I said, 'Well, I've already paid this much money on it. I don't want to turn it back in.'" Id. at 55.

## D. WALLER

Ruby Waller's transaction with CLN was arranged by the Appliance Sales Center. Waller telephoned the Appliance Sales Center and was told by a sales person that she could lease-to-buy an air conditioner which would be hers after a period of time. Testimony of Ruby Waller, Sept. 27, 1985, Transcript at 63. There was no mention of a final purchase option. Waller gave the information for the CLN application over the telephone. She made the down payment on an air conditioner the day it was delivered and signed a CLN contract. She did not read the contract nor did anyone attempt to explain it. Her understanding was that after making payments the air conditioner would be hers. Id. at 64.

---

**9.** The deferral charge stated in the Vinson contract with CLN is $30.80. It is not clear whether Ms. Vinson paid $30.80, $32 or $35 to defer the regular monthly payment. The difference is not significant.

## E. PUCKETT

Nancy Sue Puckett contracted with CLN on February 15, 1985. The transaction was arranged by Waterbed World, Inc. After choosing a waterbed, she attempted to arrange financing through an employee identified as Frank Hughes. Hughes had her fill out a "credit" application and a CLN application. He called later that afternoon and told her the credit application had been rejected but that she could acquire the waterbed through CLN. Puckett testified she made a deposit of $52.97 on February 14, 1985 and a week later another down payment of $100.[10] Puckett recalled that items five through nine and paragraph 14 were blank when she signed the agreement, however, there is no claim of fabrication.

Puckett went into Waterbed World intending to buy a waterbed. She did not want to rent. *Id.* at 55. When she signed the CLN agreement, she was not aware of the final purchase option. She "just assumed at the end of 18 months after paying all the money on them, it would be mine." *Id.* at 56. When she signed the contract, "just the basics were explained": the amount of the payments, when they were due and the late charges and that in 18 months it would be hers. *Id.* at 85. She did not read the agreement until after filing her Chapter 13 petition. *Id.* at 72.

A pattern thus emerges of the typical CLN transaction. A retail customer[11] chooses an item to purchase and attempts to arrange credit through the retailer. The credit application is rejected, but the retailer suggests an alternative method of obtaining the goods. The retailer computes and completes a CLN contract, and the customer signs it. With respect to each debtor, the CLN contracts only vary as to the goods and retailers involved, the date entered, and the payment amounts. Table I displays the terms of these debtors' contracts with CLN:

TABLE I

| DEBTOR | VINSON | HARLAN | HAMPTON | WALLER | PUCKETT |
|---|---|---|---|---|---|
| Date of Agreement | Nov. 16, 1983 | June 13, 1985 | Oct. 27, 1984 | May 15, 1985 | Feb. 15, 1985 |
| Retailer | John H. Lawhon Furniture Co. | Catalina Waterbed Gallery | Wonderful Waterbeds | Appliance Sales Center | Waterbed World, Inc. |
| Subject Goods | Sofa, loveseat chair & ottoman | Bed | Waterbed & nightstands | Air conditioner | Waterbed |
| Non-refundable Security Deposit | 154.00 | 148.00 | 154.00 | 100.00 | 98.00 |
| Monthly Payment | 78.96 | 77.19 | 78.74 | 51.79 | 49.97 |
| Set-Up Fee | ?[12] | 5.00 | 5.00 | 5.00 | 5.00 |
| Total Due at Inception | 232.96 | 230.19 | 237.74 | 156.79 | 152.97 |
| Total of Monthly Payments, (Includes Fees and Deposit) | 1,575.28 | 1,542.42 | 1,576.32 | 1,037.22 | 1,002.46 |
| Sales Tax | 87.66 | 95.76 | 99.72 | 64.80 | 63.36 |
| Insurance | 35.28 | 57.42 | 31.32 | 32.22 | 17.46 |
| Original Purchase Option | 979.47 | 781.29 | 858.78 | 424.47 | 465.82 |
| Monthly Credit | 39.50 | 28.55 | 32.40 | 13.20 | 15.87 |
| Final Purchase Option | 308.00 | 296.00 | 308.00 | 200.00 | 196.00 |
| Deferral Charge | 30.80 | 29.60 | 30.80 | 20.00 | 19.60 |

Thomas P. Anderson, the president of CLN ("Anderson"), explained the computation of payment terms. Each retailer in the CLN system receives a pre-pro-

---

**10.** Puckett Exhibit 1 contains a receipt for $100 dated February 14, 1985 with a balance due of $52.97. The CLN contract dated February 15, 1985 notes the payment due at inception is $152.97.

**11.** Throughout his testimony, Anderson referred to the "lessees" as "customers".

**12.** Apparently, the Vinsons were not charged a set up fee.

grammed hand-held computer. The retailer enters the retail and wholesale prices of the goods and the computer returns the terms. The retail price, including tax, is the cash price which the customer would have paid the retailer. The wholesale price is the cost the retailer will charge CLN and is the price paid by the retailer for the goods. Table II sets forth the wholesale and retail prices for the goods acquired by each debtor.

TABLE II

| DEBTOR | VINSON | HARLAN | HAMPTON | WALLER | PUCKETT |
|---|---|---|---|---|---|
| Retail Price, Including Tax | $1,006.43 | $957.84 | $1,045.18 | ? | $579.69 |
| Wholesale Price | 577.60 | 532.60 | 527.32 | 446.16 | 335.00 |

The monthly payment is determined by multiplying the cost of goods by a factor which allows CLN to recover approximately double the retail value of the property over an 18 month period. For furniture, the factor is .14545 and for appliances, the factor is .114.[13] The difference between the factors is the difference in the gross profit margins in the retail furniture and retail appliance markets. Anderson, Testimony, Sept. 26, 1985 at 160, 175. Sales tax and insurance charges are included in the monthly payment.

Anderson testified that the payment denominated "sales tax" was actually the state use tax.[14] He explained that the term "sales tax" was used in the agreement because the customer would not be familiar with the term use tax. Anderson, Testimony, Sept. 27, 1985 at 29, 36–37.

The "nonrefundable security deposit"[15] is approximately double the monthly payment net of taxes. According to Anderson, the nonrefundable security deposit covers refurbishing and remerchandising should the customer return goods to CLN. These "security deposits" are not segregated by CLN but become part of the general accounts of the company.

Customers are required to insure the goods. If they cannot provide insurance, then they must purchase it through CLN. If the customer provides insurance, a loss payable clause in favor of CLN must be executed before the goods leave the retailer; however, typically, the customer cannot provide insurance. CLN employs a licensed agent who issues insurance by writing a memo on CLN's master policy.[16] These debtors purchased insurance through CLN.

The original option price is the sum of the nonrefundable security deposit and the initial customer credit subtracted from the retail price, including tax. At any point during the contract term the purchase op-

13. Applying these factors to the cost of goods in each case, I do not get the result indicated in the CLN agreements. The differences range from $5.05 more than the monthly payment (Vinson) to $2.04 less (Hampton). I do not find the differences to be significant.

14. The distinction is that sales tax applies to sales of goods whereas use tax applies to rentals. *See* TENN.CODE ANN. §§ 67–6–202 and 67–6–203 (Michie Supp.1985). The state sales and use taxes are determined at the same rate. *Id.* In the context of this agreement, the use of the term "sales tax" is ambiguous. It is consistent with the debtors' claims that they were buying goods and financing their purchases. The payment of sales tax is inconsistent with the terms of the agreement which purport to characterize the transactions as leases.

15. This payment is so identificd in the CLN contract. As demonstrated below, this "nonrefundable security deposit"—itself a contradiction in terms—is not a security deposit at all, but rather a not-so-well concealed down payment.

16. CLN receives a quarterly commission of either 83% or 87% of the insurance fees minus any amounts the insurance company has paid on claims against the master policy. Anderson, Testimony, Sept. 26, 1985 at 143 (83%); Anderson, Deposition at 18 (87%).

tion can be determined by multiplying the customer credit by the number of months that the contract has run, and subtracting that sum from the original purchase option. The final option price is the total of the customer credit multiplied by 18 months, plus the nonrefundable security deposit subtracted from the retail price. The customer credit is determined by subtracting the final purchase option from the retail price and dividing by 18. There is a circularity in these equations. Anderson testified that the purchase option is designed to always be greater than the fair market value of the goods.[17] Approximately 75% of CLN's customers exercise the purchase option. The customer is reminded of the final option price by the last coupon in the payment book which is issued by CLN. See Hampton Exhibit 1.

Anderson explained at trial that the deferral charge is approximately 1/24th of the cost of the goods. Mathematically, this testimony is hard to verify in these debtors' contracts. The deferral charge seems to be closer to 1/18th of the original wholesale cost of the goods and is exactly 1/10th of the "final purchase option." No part of the deferral charge goes to reducing the amount of the purchase option.

At the end of 18 months, a customer can delay exercising the purchase option and extend the agreement on its original terms for an additional six months.[18] Table III sets forth the total payments which the debtors would have made (inclusive of insurance charges) if they exercised the purchase option at the end of either 18 or 24 months, shown in relation to the original retail price of the goods.

TABLE III

| DEBTOR | VINSON | HARLAN | HAMPTON | WALLER | PUCKETT |
|---|---|---|---|---|---|
| Retail Price, Including Tax | 1,006.43 | 957.84 | 1,045.18 | (?) | 579.69 |
| Total Payments— If Option Exercised After 18 Months | 1,918.56 | 1,895.84 | 1,915.64 | 1,269.44 | 1,215.92 |
| Total Payments— If Option Exercised After 24 Months | 2,120.04 | 2,130.26 | 2,162.36 | 1,468.76 | 1,403.06 |

Fewer than 10% of CLN customers default without returning the goods. The number of "skips"—customers who disappear with the goods—is inconsequential, probably less than 5%. If a customer becomes delinquent, Anderson claimed that CLN pursues "whatever collection avenues" it has. Anderson, Deposition at 10, 30; Anderson, Testimony, Sept. 26, 1985 at 201–203 and Sept. 27, 1985 at 30–31. On further questioning, it was revealed that CLN has never sued a customer in Davidson County.

Retailers are related to CLN by contract. Vinson Exhibit A ("Agency Agreement"). The contract authorizes the retailer to make agreements with customers on behalf of CLN, to fill out the necessary forms and to forward initial payments to CLN. The retailer is instructed to sell the goods to CLN at wholesale cost. Agency Agreement, ¶ 1(i) and ¶ 3. This "sale" by the retailer to CLN is supposed to occur before CLN "leases" the goods to the customer. However, in each case the proof conclusively shows that CLN paid the retailer anywhere from two to ten days after the con-

17. The final purchase option tends to be two and one-half to three times greater than the estimated fair market value of the goods at the end of the contract.

18. Anderson testified that the six-month extension was all that federal law would allow with-

out making additional disclosures. His deposition was somewhat confusing on this point and suggested that a customer could obtain an additional extension and purchase the goods for an insignificant amount at the end of 30 months. Anderson, Deposition at 31–32.

tracts were executed by the debtors and the goods were delivered. In three of the cases, (Vinson, Harlan and Puckett) CLN was not invoiced until from two to six days after the debtors took possession. Table IV sets forth the date that CLN was invoiced and the date the invoices were paid in relation to the transactions between the retailers and each debtor.

TABLE IV

| DEBTOR | VINSON | HARLAN | HAMPTON | WALLER | PUCKETT |
|---|---|---|---|---|---|
| Date of Contract With Debtor | Nov. 15, 1983 | June 13, 1985 | Oct. 27, 1984 | May 15, 1985 | Feb. 15, 1986 |
| Date Invoice to CLN | Nov. 18, 1983 | June 19, 1985 | Oct. 27, 1984 | May 15, 1985(?) | Feb. 16, 1985 |
| Date Invoice Paid by CLN | Nov. 22, 1983 | June 20, 1985 | Oct. 31, 1984 | May 17, 1985 | Feb. 25, 1985 |

Anderson had no explanation why the efforts to transfer ownership to CLN by invoice and payment occurred after the debtors received their goods. *See* Anderson, Deposition at 20; Anderson, Testimony, Sept. 27, 1985 at 27.

The retailer makes numerous warranties to CLN and promises to "hold CLN … harmless and indemnify CLN for any and all loss that CLN may sustain as a result of [the retailer's] breach" of warranty. *Id.* at ¶ 2. The retailer bears all costs of repossession and storage and must repurchase repossessed goods at their "amortized unit cost depreciation balance." This term is defined as the cost of goods minus the security deposit, minus (1/24th the cost of goods times payments made). If the goods are repossessed but then "released" by the retailer, then the retailer need not repurchase from CLN. Approximately 80% of repossessed furniture is repurchased by the retailers. Anderson, Deposition at 34. This contractual obligation to repurchase and the actual operation of the system as explained by Anderson contradict Anderson's testimony that the nonrefundable security deposit reimburses CLN for refurbishing and remerchandising returned goods. CLN can only be responsible for refurbishing or remerchandising when goods are re-leased without repurchase by the retailer. This is a minute percentage of contracts according to Anderson and

there is no evidence that CLN has ever expended any portion of a "nonrefundable security deposit" for this purpose. Although Anderson denied it, the nonrefundable security deposit is almost entirely profit.

In addition to up-front reimbursement of the wholesale price of the goods, the retailers receive a "participation" fee from the monthly payments made by customers. The retailers' "participation" fee is 70% of the "net lease payment" on appliances and 50% on furniture. The net lease payment is the monthly payment, minus the sales tax, minus a reserve for loss,[19] minus 1/24th of the cost of goods. If the customer exercises the purchase option, the retailer's percentage is determined in the same manner with an adjustment based on 1/24th of the cost of goods multiplied by the remaining months of the contract. CLN receives all of the "security deposit," the lease set up fee and any deferral charge.

Table V shows the retailers' "participation" and my calculations of the total payments the retailers would receive if the debtors completed their agreements. In the transactions with these debtors, when added to the initial payment from CLN for the cost of goods, the participation fee allows the retailer an average return of 118.84% of its normal retail price including sales tax.

**19.** The "reserve" for loss is $4 per $500 cost of goods.

TABLE V

| DEBTOR | VINSON | HARLAN | HAMPTON | WALLER | PUCKETT |
|---|---|---|---|---|---|
| Dealer Participation Per Month | 41.58 | 30.63 | 36.19 | 12.16 | 19.26 |
| Dealer Participation Over 18-Month Term | 748.44 | 551.34 | 651.42 | 218.88 | 346.68 |
| Total Payments to Dealer In $ and as a Percentage of the Retail Price | 1,326.04 131.80% | 1,083.94 113.17% | 1,178.74 112.78% | 665.04 ? | 681.68 117.59% |

Anderson is the president and owner of CLN. He has extensive experience in the consumer lending industry. He worked for Associates Financial Services for 16 years, attaining the position of marketing director. He operated a Curtis Mathis franchise. He is familiar with the usery laws of the State of Tennessee, and the federal truth in lending and truth in leasing regulations.

The CLN contract was developed out of "an exhaustive analysis of what the best way for us to propose a leasing alternative to do financing would be in a multi-state operation." [20] Anderson, Testimony, Sept. 26, 1985 at 150.

Anderson explained the attraction of the CLN system is its higher rate of return. Anderson, Testimony, Sept. 27, 1985 at 40. CLN and the retailer both realize a return on investment of more than 100% over the 18-month term of a typical agreement.

Anderson defended this substantial return on the ground that CLN assumes greater risk than banks and finance companies. *Id.* at 46. As a factual matter, CLN was unable to demonstrate that it assumes any quantifiable risk in its transactions. The total payments made by the customer at inception range from 35% to 45% of CLN's initial financial commitment. This allows CLN to at least break even at a very early stage in the contract term. If the goods are returned or repossessed, the retailers are obligated to repurchase them regardless of condition (unless they can re-lease them). CLN's only risk in these transactions is that a customer may disappear with the goods in the first few months of an agreement. Anderson testified that the number of "skips" was inconsequential and represented less than 5% of its total business.

## III. THE WATERBED WORLD TRANSACTIONS

Puckett executed two agreements with Waterbed World which do not involve CLN. Waterbed World used CLN's form and wrote the words "Consumer Lease Network, CLN, Waterbed World, Inc., all are same in this contract" across the top. Using the computer it received from CLN, Waterbed World filled in the payment terms as if the transaction were with CLN. Table VI sets forth the goods received by Puckett from Waterbed World, the dates of the transactions and the payment terms.

TABLE VI

| | | |
|---|---|---|
| Date of Agreement | Feb. 15, 1985 | May 4, 1985 |
| Subject Goods | Color T.V. with remote | Sofa, loveseat and chair |

**20.** Anderson testified at several points that the CLN agreement is an alternative to financing for retailers who cannot fulfill their customer needs through traditional financing arrangements. *See* Anderson, Testimony, Sept. 27, 1985 at 59; Anderson, Deposition at 39.

| | | |
|---|---|---|
| Non-refundable Security Deposit | None | 88.00 |
| Monthly Payment | 29.00 | 46.15 |
| Lease Set-Up Fee | 5.00 | 5.00 |
| Total Due at Inception | 34.00 | 139.15 |
| Total of Monthly Payments, (Includes Fees and Deposit) | 527.00 | 923.70 |
| Sales Tax | 37.62 | 56.88 |
| Insurance | None | None |
| Original Purchase Option | 345.47 | 537.25 |
| Monthly Credit | 10.09 | 21.25 |
| Final Purchase Option | 174.00 | 176.00 |
| Deferral Charge | 11.60 | 17.60 |

## IV. DISCUSSION

### A.

The Bankruptcy Code distinguishes between leases and security agreements.[21] In these Chapter 13 cases, if the agreements are true leases, the debtors can retain possession and use of the goods only by complying with the strictures of § 365—including the curing of defaults in payments, assurance of future payments and compensation for pecuniary loss to the lessor. *See* 11 U.S.C.S. § 1322(b)(7) (Law.Co-op.1986). If the agreements are intended for security, the debtors may pay the "value" of the goods through their plans, may attack the validity of the security interests or may modify the rights of the lender in various ways. *See, e.g.,* 11 U.S.C.S. §§ 1322(b)(2) and 1325(a)(5) (Law.Co-op. 1986).

The Bankruptcy Code defines a security agreement as an "agreement that creates or provides for a security interest." 11 U.S.C.S. § 101(42) (Law.Co-op.1986). A "security interest" is defined as a "lien created by an agreement." 11 U.S.C.S. § 101(43) (Law.Co-op.1986). A "lien" is defined as a "charge against or interest in property to secure payment of a debt or performance of an obligation." 11 U.S.C.S. § 101(31) (Law.Co-op.1986).[22]

These definitions are intentionally broad to encompass all manner of financing devices. H.R.REP. NO. 595, 95th Cong., 1st Sess. 311–14 (1977) U.S.Code Cong. & Admin.News, 1978, pp. 5963, 6268, 6271; S.REP. NO. 989, 95th Cong., 2d Sess. 24–26 (1978) U.S.Code Cong. & Admin.News 1978, pp. 5787, 5809–5812 *reprinted in* 1985 COLLIER (pamphlet ed.) BANKR. CODE 19. The House and Senate Reports state that whether a transaction is a lease or a security interest "will depend on whether it constitutes a security interest under applicable State or local law." *Id.* at

---

**21.** The difficulty of distinguishing between leases and security interests has led more than one commentator to suggest that the distinction be abolished. *See* Jones, *Lease or Secured Transaction—The Saga Continues Under the Bankruptcy Act,* 1985 COMM.L.J. 281, 287 (June/July); Peden, *The Treatment of Equipment Leases as Security Agreements Under the Uniform Commercial Code,* 13 WM. & MARY L.REV. 110, 158 (1971). For a thoughtful and highly provocative analysis *see* Ayer, *On The Vacuity of the Sale/Lease Distinction,* 68 IOWA L.REV. 667 (1983) and Ayer, *Further Thoughts on Lease and Sale,* 2 ARIZ.ST.L.J. 341 (1983). The distinction between leases and "leases intended for security" is one of the most frequently litigated questions under the U.C.C. J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code,* § 22–3 at 878 (2d ed. 1980). For a discussion of the ancient roots of the distinc-tion, *see* 2 F. Pollock & F. Maitland, *The History of English Law Before the Time of Edward I,* 106–124 (2d ed. 1923).

**22.** "Debt" is defined as "liability on a claim." 11 U.S.C.S. § 101(11) (Law.Co-op.1986). A claim is defined as a:

    (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

    (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

20. *See also American Standard Credit, Inc. v. National Cement Co.,* 643 F.2d 248, 261 (5th Cir.1981) (federal courts are bound to apply applicable state law "insofar as such interpretation may be discerned."); *In re Holywell Corp.,* 51 B.R. 56, 13 BANKR. CT.DEC. (CRR) 446, 447 (Bankr.S.D.Fla. 1985).

These proceedings are governed by Tennessee law. Security interests in personal property are subject to Tennessee's version of the Uniform Commercial Code. A security interest is defined as:

> an interest in personal property or fixtures which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (§ 47–2–401) is limited in effect to a reservation of a "security interest." ... Unless a lease or consignment is intended as security, reservation of title thereunder is not a "security interest" ... Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

TENN.CODE ANN. § 47–1–201(37) (Michie 1979).[23] The difficulties of application of this definition are demonstrated in many Tennessee[24] and federal[25] decisions, and in opinions interpreting identical provisions of the laws of other states.[26]

**23.** Tennessee amended its version of the Uniform Commercial Code in 1985 effective January 1, 1986. This case is governed by the pre-amendment version. It does not appear that the outcome of this case would be different under the 1986 version.

**24.** *See Chuck Hutton Leasing,* Shelby Law No. 57, slip op.; *Louis Foreign Car Parts, Inc. v. Mylee Digital Sciences, Inc.,* No. ——, slip op. (Tenn.Ct.App. Aug. 17, 1981); *Goodwin Brothers Leasing, Inc. v. H & B, Inc.,* 597 S.W.2d 303 (Tenn.1980); *and cf. United States Fidelity and Guaranty Co. v. Thompson and Green Machinery Co.,* 568 S.W.2d 821 (Tenn.1978) (interpreting the law of conditional sales); *Pollack v. Ryder Truck Rental, Inc.,* No. ——, slip op. (Tenn. Ct.App. Oct. 24, 1975).

**25.** *See Devita Fruit Co. v. FCA Leasing Corp.,* 473 F.2d 585 (6th Cir.1973) (Phillips, C.J.); *Curtis Mathis v. Howse,* Adv. No. 383–148 slip op. (M.D.Tenn. June 6, 1983) (adopting verbatim the report of Bankruptcy Judge George C. Paine, II, sitting as standing master); *Celeryvale Transport,* 44 B.R. at 1007; *Consumer Lease Network, Inc. v. Gray,* No. 384–01717 slip op. (Bankr.M.D. Tenn. Oct. 2, 1984); *Consumer Lease Network, Inc. v. Pellin,* No. 384–01918 slip op. (Bankr.M. D.Tenn. Oct. 2, 1984); *Coble Systems, Inc. v. Coors of the Cumberland, Inc.,* 19 B.R. 313 (Bankr.M.D.Tenn.1982); *Coode v. M & J Financial Corp. (In re Boling),* 13 B.R. 39 (Bankr.E.D. Tenn.1981) ("Boling I"); *Coode v. Peterbilt Leasing (In re Boling),* Adv. No. 3–80–0603 (Bankr.E. D.Tenn.1981) ("Boling II"); *In re Winston Mills, Inc.,* 6 B.R. 587, 2 COLLIER BANKR.CAS.2d (MB) 1267 (Bankr.S.D.N.Y.1980) (applying Tennessee law); *Pippin Way, Inc. v. Four Star Music Co.,* 2 B.R. 454 (Bankr.M.D.Tenn.1979); *Polaris Industries,* 14 U.C.C.REP.SERV. at 182.

**26.** *See, e.g., Fashion Optical,* 653 F.2d at 1385 (OKLA.STAT.ANN.TIT. 12A § 1–201(37) (West 1963); *Davis v. Colonial Securities Corp.,* 541 F.Supp. 302 (E.D.Pa.1982) (12A PA.STAT.ANN. § 1–201(37) (Purdon 1970) (repealed)) *appeal dismissed* 720 F.2d 661 (3d Cir.1983); *Clark v. Rent-It Corp.,* 511 F.Supp. 796 (S.D.Iowa 1981) *rev'd,* 685 F.2d 245 (8th Cir.1982) *cert. denied,* 459 U.S. 1225, 103 S.Ct. 1232, 75 L.Ed.2d 466 (1983) (Iowa Code § 554.1201(37)); *Waldron v. Best TV and Stereo Rentals, Inc.,* 485 F.Supp. 718 (D.Md.1979) (MD.COM.LAW CODE ANN. § 1–201(37)); *Leasing Service Corp. v. American National Bank & Trust Co.,* 19 U.C.C.REP.SERV. (CALLAGHAN) 252 (D.N.J.1976) (U.C.C. § 1–201(37)); *RCA Corp. v. IDT Inc. (In re Janesville Lodging Limited, I.D.T.),* 35 B.R. 672 (Bankr.W. D.Wis.1983) (WIS.STAT. § 401.201(37)); *Fruehauf Corp. v. International Plastics, Inc.,* 18 B.R. 583 (Bankr.D.Kan.1982) (KAN.STAT.ANN. § 84–1–201(37) (1980 Supp.)); *Holder & Northern,* Adv. No. 381–0300, slip op. (N.C.GEN.STAT. § 25–1–201(37) (1965 ed. 1979 Com.Supp.)); *In re Peacock,* 6 B.R. 922 (Bankr.N.D.Tex.1980) (TEX.BUS. & COMM.CODE § 1–201(37)); *K.L.C., Inc. v. Brookside Drug Store, Inc.,* 3 B.R. 120, 3 COLLIER BANKR.CAS.2d (MB) 270 (Bankr.D.Conn.1980) (CONN.GEN.STATS. § 42a–1–201(37)); *In re Transcontinental Industries,* 3 U.C.C.REP.SERV. (CALLAGHAN) 235 (Bankr.N.D.Ga.1965) (Ga. § 11–1–201(37)); *In re Royers Bakery, Inc.,* 1 U.C.C.REP.SERV. (CALLAGHAN) 342 (Bankr.E.D.Pa.1963) (U.C.C. § 1–201(37)).

The last sentence of § 47–1–201(37) mandates that the issue is fundamentally factual. White and Summers in their treatise on the Uniform Commercial Code offer this list of factors relevant to characterization as a lease or a security interest:

Of note is that courts consider the lessor's status as a financer to be relevant. So, too, such factors as whether the lessee is required to insure the goods in favor of the lessor for a value equal to the total rental payments; the risk of loss or damage is on the lessee; the lessee is to pay for taxes, repairs and maintenance; there are default provisions governing acceleration and resale; a substantial, non-refundable deposit is required; the goods are to be selected from a third party by the lessee; the rental payments are equivalent to the cost of goods plus interest; the lessor lacks facilities to store or retake the goods; the lease is to be discounted with a bank; warranties normally found in a lease are excluded ... this list is not exhaustive. Nor is any one factor conclusive standing alone. Each transaction must be viewed on its facts bearing in mind the Code's abhorrence of secret liens.

White & Summers, *supra* n. 21 at 882–83 (footnotes omitted) *and see* cases cited.

The courts have often consulted lists of factors but with care to preserve the broader flavor of the transaction:

The appropriate course to follow is to analyze all the relevant factors surrounding the lease agreement and relationships created therein, in determining if the parties in fact intended to create a security interest. The court finds this approach preferable to adoption of a rigid test or set of criteria because of the fact sensitive nature of the inquiry and the need for a flexible analytical framework that enables the court to analyze the totality of the facts presented.

*Sight and Sound of Ohio, Inc. v. Wright,* 36 B.R. 885, 890 (S.D.Ohio 1983). *See Yankee Leasing Co. v. Mountain Carpet, Inc.,* 11 B.R. 729, 731 (Bankr.D.Vt.1979) (9A V.S.A. § 1–201(37)); *In re Witkowski,* 37 B.R. 352 (Bankr.D.N.D.1984) (NDCC § 41–01–11); *In re Alpha Creamery, Inc.,* 4 U.C.C.REP.SERV. (CALLAGHAN) 794, 797 (Bankr.W.D.Mich.1967) (M.S.A. § 19.-1201(37)).

■ Applying the relevant factors and analysis, it is abundantly clear that the CLN transactions are not true leases but are disguised sales of goods with financing by CLN and reservation of rights consistent with a security interest.

*1. Intent of Parties.* It is beyond peradventure that these debtors intended to buy consumer goods and believed that their contracts with CLN were sales with financing. The debtors were encouraged by the retailers to believe that they were purchasing and that the CLN contract was financing. CLN is responsible for this impression. The salespeople and credit managers with whom the debtors dealt were acting pursuant to agency agreements with CLN. According to Anderson, CLN undertook the responsibility to train these agents. However, CLN's agents demonstrate little ability to explain these transactions and CLN exercises no obvious control over what the retailers tell customers. The forms used by CLN are indistinguishable from those routinely used in conventional security transactions. CLN uses a payment book and a monthly coupon arrangement identical to those used by installment loan financers. Ostensibly to avoid "confusing" its customers, CLN avoids phrases like "use tax" which might reveal that the transaction is not an ordinary sale with financing. CLN must accept the consequence that its documents and its agents have consistently (mis)led the public to believe that the CLN contract is just another form of financing.

This court is required to divine the objective intent of the parties. *Leasing Service Corp.,* 19 U.C.C.REP.SERV. at 258; *Peacock,* 6 B.R. at 924; G. Gilmore, *Security Interests in Personal Property,* § 11.2 at 338 (1965). Where the consumer reasonably believes based on the seller's representations that a transaction is a sale with

financing, the agreement between them will be treated as a security interest and not a lease. *See Clark*, 685 F.2d at 248; *Goodwin Brothers*, 597 S.W.2d at 303.

*2. CLN's Status as a Financer.* CLN is in the business of financing sales of consumer goods and is not in the business of renting or leasing consumer goods to the public. CLN has no facility for the offering of goods for rental or lease to the general public. CLN does not own the goods it purports to lease at the time of delivery to the customer. CLN has no facility for the transportation or storage of merchandise. CLN cannot repair or remerchandise returned goods. CLN is in the financing business: the retailers sell consumer goods, CLN finances the sales and provides a substantial "participation" to the retailers. CLN eschews all of the ordinary characteristics of the business of renting or leasing goods to the public.[27] CLN has no capacity to enforce its contracts by repossession or otherwise and has never exercised its remedies in this jurisdiction. A "seller/lessor" that is not structured like a lessor of goods will be properly characterized as a financer and its agreements will be treated as security instruments. *See Transcontinental Industries*, 3 U.C.C. REP.SERV. at 244; *Brookside Drug*, 3 B.R. at 122; *and see Fashion Optical*, 653 F.2d at 1389 n. 3 (*quoting* White & Summers); *Fruehauf*, 18 B.R. at 588; *Celeryvale Transport*, 44 B.R. at 1007 (*quoting* White & Summers).

*3. Insurance and Risk of Loss.* CLN experiences none of the normal insurance and risk responsibilities attendant to the leasing or renting of consumer goods. CLN does not insure itself (as an owner of goods might) against the possibility of loss of or injury from the use of the goods it claims to lease. The customer is required to insure the goods in favor of CLN. CLN sells insurance with its financing as do banks and finance companies. The risk of loss is on the customer or on the retailer. Upon default, CLN can realize on its collateral and CLN has recourse against the retailer. This arrangement is consistent with the operation of a finance company not a lessor of goods. Assumption of all risk of loss by the customer or a middleman is one indicia of ownership frequently cited as evidence that an agreement is a security interest and not a true lease. *See Fashion Optical*, 653 F.2d at 1389 n. 3 (*quoting* White & Summers); *Sight and Sound of Ohio*, 36 B.R. at 885; *Leasing Service Corp.*, 19 U.C.C.REP.SERV. at 260; *In re Cook*, 52 B.R. 558, 562 (Bankr. D.N.D.1985); *In re Chisholm*, 54 B.R. 52 at 53–54 (Bankr.Fla.1985) (*quoting* White & Summers); *Celeryvale Transport*, 44 B.R. at 1013 (*quoting* White & Summers); *Witkowski*, 37 B.R. at 353; *Holder & Northern*, Adv. No. 381–0300, slip op. at 3; *Brookside Drug*, 3 B.R. at 122; *Chuck Hutton Leasing*, Shelby Law No. 57, slip op. at 1; *but see Lemay v. Strohmans, Inc.*, 510 F.Supp. 921 (E.D.Ark.1981);[28] *Mejia*, 332 S.E.2d at 172 (though many factors "more common to security were present, including duty to insure court found a lease was intended based on other factors"); *U.S. Fidelity*, 568 S.W.2d at 821.

*4. Maintenance and Repairs.* The customer is unilaterally responsible for all

---

**27.** In contrast to the CLN transactions and the transactions directly with Waterbed World, this court also took testimony in the case of *Option Rentals, Inc. v. Baker,* Case No. 385–02090 regarding its "rental" business. [The *Baker* proceeding was disposed of by separate order.] The Option Rentals' agreement is similar to the CLN agreement. The customer can terminate the agreement at any time by returning the goods. The purchase option is always greater than the fair market value of the goods, except that at the end of 78 weeks, an Option Rentals' customer obtains ownership for no additional consideration. Option Rentals maintains its own store, warehouses its own goods and fi-nances its purchases through Borg-Warner Acceptance Corporation. It does not require its customers to purchase insurance. It tries to re-rent everything and generally succeeds. The payment customers make at inception is generally, $15, $18 or $20 which is simply the first week's "rent." Customers pay "use" taxes. No down payment is required.

**28.** The Eighth Circuit's opinion in *Clark,* 685 F.2d at 245, involved a lease identical to that discussed in *Lemay,* and most likely leaves *Lemay* without precedential value.

repairs and maintenance of goods financed by CLN. The obligation to repair and maintain is an incident of ownership evidencing intent to create a security interest and not a true lease. *See Fashion Optical,* 653 F.2d at 1389 n. 3 (*quoting* White & Summers); *Chisholm,* 54 B.R. at 53–54 (*quoting* White & Summers); *Cook,* 52 B.R. at 562; *Celeryvale Transport,* 44 B.R. at 1013 (*quoting* White & Summers); *Witkowski,* 37 B.R. at 353; *Holder & Northern,* Adv. No. 381–0300, slip op. at 5; *Brookside Drug,* 3 B.R. at 123; *Chuck Hutton Leasing,* Shelby Law No. 57, slip op. at 1; *but see Lemay,* 510 F.Supp. at 921; *Mejia,* 332 S.E.2d at 172; *U.S. Fidelity,* 568 S.W.2d at 821.

5. *Taxes.* All taxes in a CLN transaction are paid by the customer. This responsibility is denominated as "sales tax" notwithstanding CLN's protest that these transactions are not subject to sales tax. The obligation to pay taxes when borne by the consumer is an incident of ownership indicative of a secured transaction. *See Fashion Optical,* 653 F.2d at 1389 n. 3 (*quoting* White & Summers); *Sight and Sound of Ohio,* 36 B.R. at 890; *Leasing Service Corp.,* 19 U.C.C.REP.SERV. at 260; *Chisholm,* 54 B.R. at 53–54 (*quoting* White & Summers); *Cook,* 52 B.R. at 562; *Celeryvale Transport,* 44 B.R. at 1013 (*quoting* White & Summers); *Witkowski,* 37 B.R. at 353; *Holder & Northern,* Adv. No. 381–0300, slip op. at 5; *Brookside Drug,* 3 B.R. at 122; *Chuck Hutton Leasing,* Shelby Law No. 57, slip op. at 1; *but see U.S. Fidelity,* 568 S.W.2d at 821 (held on other grounds that the agreement was a true lease); *Mejia,* 332 S.E.2d at 170 (same); *and cf. Fruehauf,* 18 B.R. at 583 (same).

6. *Default Provisions.* Upon default, CLN is entitled to delivery and surrender of the collateral, all matured payments, late charges, attorneys' fees, damages for excessive wear and all returned premiums from any insurance obtained under the contract. CLN reserves the right to enter the debtor's premises to retake possession of the property. After retaking possession, CLN has recourse against the retailer. CLN's rights upon default are substantially the same as the rights granted to a secured lender by Part V of Article 9 of the Uniform Commercial Code.[29] TENN. CODE ANN. §§ 47–9–501 *et seq.* (Michie 1979). The only significant financing term missing from the default provisions of the CLN contract is a right to accelerate unmatured payments. As discussed *infra,* the omission of this right is not compelling where the consumer is constrained by other provisions of the agreement to continue making payments to avoid a forfeiture and loss of equity. Where a contract contains substantial default provisions including the forfeiture of earned investment in the collateral courts have characterized the transaction as a security agreement rather than a lease. *See Sight and Sound of Ohio,* 36 B.R. at 891; *Holder & Northern,* Adv. No. 381–0300, slip op. at 16; *Chuck Hutton Leasing,* Shelby Law No. 57, slip op. at 7–9. *See also Witkowski,* 37 B.R. at 353. *But see Fruehauf,* 18 B.R. at 583; *Yankee Leasing,* 11 B.R. at 729 (agreement is a lease despite substantial default provisions); *U.S. Fidelity,* 568 S.W.2d at 821 (same); *Mejia,* 332 S.E.2d at 170.

7. *Nonrefundable Security Deposit.* The "nonrefundable security deposit" required by CLN is a poorly disguised down payment having no other economic reality in the conduct of CLN's business. This deposit is not related to security concerns of CLN. The requirement of this nonrefundable security deposit is a convincing indicator that this agreement is a security interest and not a true lease. *See Fashion Optical,* 653 F.2d at 1389 n. 3 (*quoting* White & Summers); *Leasing Service Corp.,* 19 U.C.C.REP.SERV. at 260; *Chisholm,* 54 B.R. at 53–54 (*quoting* White & Summers); *Celeryvale Transport,* 44 B.R. at 1013 (*quoting* White & Summers); *Brookside Drug,* 3 B.R. at 120.

---

**29.** Because of CLN's recourse rights against the retailer, the rights of a secured lender under the U.C.C. to dispose of collateral are not obviously implicated in this case—CLN never "disposes" of collateral other than to require the retailer to repurchase.

8. *Three Party Transactions.* The three party nature of all CLN transactions renders these agreements especially suspect in the sale/lease investigation. Customers select their goods from the retailer. CLN purports to "buy" the goods for the customer (after delivery to the customer) but the retailer remains obligated to pay CLN in the event the customer defaults. CLN merely provides the money that makes the sale work. Where the customer's goods are purchased by the seller/lessor from a designated third party for the customer, courts have found the transaction to be a secured financing arrangement and not a true lease. *See National Equipment Rental Limited v. Priority Electronics Corp.*, 435 F.Supp. 236 (E.D.N.Y. 1977); *Leasing Service Corp.*, 19 U.C.C. REP.SERV. at 292; *Polaris Industries*, 14 U.C.C.REP.SERV. at 182; *Transcontinental Industries*, 3 U.C.C.REP.SERV. at 235; *cf. Fruehauf*, 18 B.R. at 588.

9. *Calculation of Payments.* The calculation of payments in a CLN contract, painfully detailed above, demonstrates powerfully that CLN does not share the perspective of the true lessor. CLN calculates the monthly payment to produce double the *retail* value of goods within 18 months. CLN employs a factor appropriate to the *retail* market for the kind of goods financed. The key number in the calculation is the amount the customer would pay at retail. This amount is the amount that would normally be financed in a security transaction. As Anderson explained, the payments are designed to produce a certain multiple of retail price; they do not reflect CLN's cost of goods, depreciation of the property or expected value at the end of the contract term. The monthly payment far exceeds the amount that would be necessary to compensate a legitimate lessor for the loss of value over the lease term due to aging, wear and obsolescence. *Fashion Optical*, 653 F.2d at 1389; *Leasing Service Corp.*, 19 U.C.C. REP.SERV. at 259; *Fruehauf*, 18 B.R. at 586; *Holder & Northern*, Adv. No. 381–0300, slip op. 4–5. The fact that all calculations work backwards from the payment of a sum certain is further evidence of intent to sell and create a security interest. *Sight and Sound of Ohio*, 36 B.R. at 890.

10. *Warranties.* CLN disclaims all warranties. CLN passes to the customer only the manufacturers' warranties. The fact that CLN disclaims all warranties favors characterization of these transactions as security agreements and not true leases. *See Fashion Optical*, 653 F.2d at 1389 n. 3 (*quoting* White & Summers); *Chisholm*, 54 B.R. at 53–54 (*quoting* White & Summers); *Cook*, 52 B.R. at 562; *Celeryvale Transport*, 44 B.R. at 1013 (*quoting* White & Summers); *Witkowski*, 37 B.R. at 353; *Brookside Drug*, 3 B.R. at 123.

11. *Equity Build-up.* Though cleverly described by CLN as a reduction in the purchase option rather than as an accumulation of equity, the customer in a CLN transaction acquires value in the collateral each month. The purchase option is calculated by subtracting the amount of the nonrefundable security deposit from the retail price and subtracting a fixed amount of principal per month, with a balloon payment at the end of the term. Although Mr. Anderson testified that this is not building equity in the property, there is simply no other term for it. *Davis*, 541 F.Supp. at 305; *Yankee Leasing*, 11 B.R. at 731; *Brookside Drug*, 3 B.R. at 122.

12. *Useful Life.* The goods all have a useful life to CLN's customers in excess of the terms of the contract with CLN. The goods are consumer goods that will be used continuously. Where goods have a useful life to the customer in excess of their economic value to the "lessor" an inference is raised that the agreement is a security interest and not a true lease. *See Fashion Optical*, 653 F.2d at 1391; *Leasing Service Corp.*, 19 U.C.C.REP.SERV. at 292; *Celeryvale Transport*, 44 B.R. at 1007; *Fruehauf*, 18 B.R. at 587; *Peacock*, 6 B.R. at 926–27.

13. *Deferral Charges.* The "deferral charge" allows the customer to keep possession of the goods without reduction of the "principal" amount of the customer's

obligation. The existence of this deferral option to the regular installment payment is indicative that something more than true leasing is at the heart of the CLN transaction. *See Sight and Sound of Ohio*, 36 B.R. at 885 (customer had the right to reinstate the agreement on default for arrears plus $5).

*14. Sophistication of Parties.* The relative sophistication of the parties and the extent to which the bargaining independence of the parties has been respected are relevant to characterization of a transaction as a sale or lease. *Brookside Drug*, 3 B.R. at 124; *Goodwin Brothers*, 597 S.W.2d at 305.

These debtors are not sophisticated business people. The CLN contract was developed by a sophisticated businessman intent on organizing a financing business which could function outside of the usury laws, the perfection rules of the Uniform Commercial Code and Truth in Lending. The retailer/agent (for obvious reasons) encourages the customer to accept "alternative" financing through CLN. The CLN contract is cleverly designed to look like an ordinary financing contract. The contract was not carefully explained to these debtors and the debtors did not understand its unusual features. As discussed below, the customer cannot realistically retreat from the contract after making the substantial nonrefundable security deposit and beginning payments. It is a trap in part created by the customer's needs, but it is a trap designed by CLN, disguised by it as a "lease," and sold to unsophisticated consumers on less than complete information.

### B.

■ To avoid overwhelmingly adverse facts, CLN and Waterbed World assert that "as a matter of law" the agreements are true leases because the debtors can return the goods and terminate the contracts. Though a contractual right of termination is consistent with characterization as a lease, *see Janesville Lodging*, 35 B.R. at 672; *In re Shangri-La Nursing Center, Inc.*, 31 B.R. 367, 372 (Bankr.E.D.N.Y.1983)

(option to terminate tends to indicate transaction was not intended for security); *Peacock*, 6 B.R. at 924 (option should "undoubtedly" make transaction a true lease); *Commerce Union Bank v. John Deere Industrial Equipment Co.*, 29 U.C.C.REP. SERV. (CALLAGHAN) 1436 (Ala.Sup.Ct. 1980); *Four Star Music*, 2 B.R. at 460 ("A contract with an arbitrary right or option to cancel lacks mutuality and is unenforceable [u]nless this right of cancellation is supported by independent consideration"), it is not outcome determinative as a matter of law. *Clark*, 685 F.2d at 245; *Aoki v. Shepherd Machinery Co. (In re J.A. Thompson & Son, Inc.)*, 665 F.2d 941 (9th Cir.1982); *Sight & Sound of Ohio*, 36 B.R. at 885; *Davis*, 541 F.Supp. at 302; *Waldron*, 485 F.Supp. at 718; *Royer's Bakery*, 1 U.C.C.REP.SERV. at 342; *cf. U.S. Fidelity*, 568 S.W.2d at 825 ("Of course, the intent of the parties is always controlling and is to be ascertained from the whole transaction, not merely from the language employed.").

The definition of security interest is very broad and includes financing agreements that contain provisions for termination. *See* TENN.CODE ANN. § 47–9–102(2) (Michie 1979). It is in the very nature of a security interest that a party may make agreed upon payments or default, and upon default relinquish the collateral to the secured party. *See* TENN.CODE ANN. § 47–9–501 *et seq.* (Michie 1979) (default).

■ The right to terminate has historical significance, but the argument that a termination clause negates the existence of a real obligation is unpersuasive where the customer's choice is to continue making payments or to forfeit substantial rights and interests in the collateral. *Aoki*, 665 F.2d at 946 n. 7; *and see Davis*, 541 F.Supp. at 305. If the right to cancel is wholly arbitrary and without penalty, it is indicative of bona fide intent to lease. Where the right to terminate involves a forfeiture, the option on paper cannot overcome the substance of the transaction: the termination option has simply been paid for

by the debtor as part of the underlying sale. *See Four Star Music,* 2 B.R. at 460.

On these facts, it would be particularly inappropriate to allow the termination clause to control characterization. CLN included the termination clause to maximize the probability that courts would find these contracts to be leases; but it has structured every other aspect of these transactions to overcome the possibility that its customers will terminate. Termination immediately works a dramatic forfeiture because of the substantial "nonrefundable security deposit." Coupled with this deposit, a CLN customer quickly makes such a substantial investment relative to the value of the underlying goods that the option to terminate becomes economic suicide. When a CLN customer contemplates termination, CLN talks the customer into deferral payments. The great majority of CLN customers come to understand the unreality of the termination option and complete payments to avoid forfeiting property for which they have paid several times value.

### C.

■ CLN also argues that the purchase option in its contracts is not "nominal" therefore its contracts are leases and not intended for security. A purchase option is one factor in the sale/lease calculus. *In re Marhoefer Packing Co., Inc.,* 674 F.2d 1139 (7th Cir.1982); *Fashion Optical,* 653 F.2d at 1389; *Devita Fruit,* 473 F.2d at 589; *National Equipment Rental,* 435 F.Supp. at 239; *Celeryvale Transport,* 44 B.R. at 1013–15; *Fruehauf,* 18 B.R. at 586; *Pollack,* No. ——, slip op. at 3; *Polaris Industries,* 14 U.C.C.REP.SERV. at 185. TENN.CODE ANN. § 47–1–201(37) gives some guidance on the effect of a purchase option. The existence of a purchase option does not automatically make the agreement a security interest. After completion of payments, if the lessee may become the owner for no consideration or for a nominal

consideration, a presumption arises that the agreement is a security interest.[30] The reverse is not true: if the purchase option is greater than nominal, all factors must be considered. *See Marhoefer Packing,* 674 F.2d at 1145; *Fashion Optical,* 653 F.2d at 1389; *Leasing Service Corp.,* 19 U.C.C. REP.SERV. at 259; *Cook,* 52 B.R. at 562; *Celeryvale Transport,* 44 B.R. at 1013–14; *Fruehauf,* 18 B.R. at 586; *Peacock,* 6 B.R. at 925. Several courts have determined that an agreement was intended for security despite the absence of any purchase option. *See Leasing Service Corp.,* 19 U.C.C.REP.SERV. at 259; *Cook,* 52 B.R. at 558; *Brookside Drug,* 3 B.R. at 120. *See also Fashion Optical,* 653 F.2d at 1389 (citing cases). *But see Devita Fruit,* 473 F.2d at 585 (no option and no other evidence of intent).

The term "nominal" consideration eludes definition. Seeking to develop a test, courts have compared the option price to the original retail price, to the fair market value at the end of the lease term or date exercised and to the total installments under the contract. *See* ANNOT., 76 A.L. R.3d 11, 46–54 (1977) (collecting cases). If the purchase option is greater than the fair market value of the goods, the courts have often applied an "economic realities" test to determine whether the option is in fact nominal. *Id. and see Fashion Optical,* 653 F.2d at 1389; *Coble Systems,* 19 B.R. at 317; *Holder & Northern,* Adv. No. 381–0300, slip op. at 13; *Peacock,* 6 B.R. at 926; *Yankee Leasing,* 11 B.R. at 732; *Alpha Creamery,* 4 U.C.C.REP.SERV. at 798. This test can be stated as follows: "Whether the 'lessee' has no choice but to exercise the purchase option or has no sensible alternative." *Alpha Creamery,* 4 U.C.C. REP.SERV. at 798.

The purchase option in the CLN contract seems ideally designed to be great enough that customers will not exercise the option until later in the contract term (thus max-

---

**30.** Whether this presumption is conclusive or rebuttable has not been settled by the courts in Tennessee. Several courts outside of Tennessee have determined the presumption is conclusive, although there are cases on both sides. *See Marhoefer Packing,* 674 F.2d at 1139 (conclusive) (citing cases); *Aoki,* 665 F.2d at 946 (conclusive) (citing cases).

imizing return to CLN and its "participating" retailer) but the economic reality of every CLN transaction is that the customer has no sensible choice but to eventually exercise the option. Most CLN customers do. CLN encourages exercise of the option price and has permitted the option to be paid in installments after the "regular" payments. On these facts, it cannot be said that the purchase option overcomes the multitude of factors favoring characterization of the CLN contract as a security interest.

### D.

■ There are factors which distinguish Waterbed World's separate agreements with Puckett from the contracts with CLN. Waterbed World is the retailer of the goods which were transferred to the debtor.

Waterbed World has its own facilities to retake, store and remerchandise goods.

On the other hand, the terms of these separate agreements are essentially the same. The debtor was led to believe (reasonably) that she was financing a purchase when she executed the contracts. The return on investment is even greater for Waterbed World than CLN because it is only financing the wholesale value of the goods. Waterbed World is in the retail business, it offers virtually no true rental or leasing business. I believe Waterbed World intended to sell the goods to Puckett and saw the CLN contract as a painless and immensely profitable way to arrange its own financing. Accordingly, though it is a closer question, I find these separate agreements were also intended for security.

An appropriate order will be entered.

### APPENDIX A

LEASE AGREEMENT
AND
CONSUMER LEASING DISCLOSURE STATEMENT ≠5531-1
(Disclosures are provided pursuant to the Federal Consumer Leasing Act)

WHITE—ORIGINAL
YELLOW—LESSEE COPY
PINK—HOLDERS COPY
GREEN—AGENT'S COPY

Lessor(s) herein identified as follows:
Consumer Lease Network, Inc.
P. O. Box 1450, Nashville, TN 37202,
herein called "CLN", owner of the leased property; and

(b) APPLIANCE SALES CENTER
Arranger of this lease herein called "Agent", whose address is:
No. 425a 8th. AVE. SO. Street
City NASHVILLE, TENN. 37203 Zip Code

Lessee(s) herein identified as follows:

RUBY WALLER
and (Name)
(Address) 810 BLUE RIDGE DR.
No. Street
NASHVILLE, TENN 37207
City State Zip Code

1. CLN leases to Lessee, and Lessee leases from CLN, the property hereinafter described on the terms and conditions herein provided.
2. DESCRIPTION OF LEASED PROPERTY: (P/L Means Previously Leased)

| QTY. | NEW | P/L | MANUFACTURER | ITEM | MODEL | | SERIAL NO |
|---|---|---|---|---|---|---|---|
| 1 | x | | WHIRLPOOL | AIR/CONDITIONER | AC1202xm | 4071 | |

☐ THAT PROPERTY DESCRIBED IN THE ATTACHED EXHIBIT

3. TOTAL PAYMENT DUE AT INCEPTION: ☒ first month advance monthly payment of $ 51.79
☐ (other) non-refundable security deposit $ 100.00, plus $ 5.00 lease set-up fee          $ 156.79

4. TERM OF THIS LEASE: 18 months, commencing with the date hereof. The first monthly payment is the total payment due at inception, item 3 above, payable with the execution hereof; 17 subsequent consecutive equal monthly payments of $ 51.79 each due on the 20 day of each month beginning the 20 day of JUNE ,19 85

5. TOTAL MONTHLY PAYMENT:          $ 51.79
6. TOTAL OF MONTHLY PAYMENTS: (multiply number of subsequent monthly payments in item 4 by the amount of each and add item 3)          $ 1037.22
7. TOTAL OF OTHER CHARGES PAYABLE TO LESSOR: NONE          $ NONE
(identify each charge and amount and then give aggregate total in right column)

8. FEES AND TAXES: Total amount Lessee will pay during the lease term for official fees and taxes: Sales tax
$ 3.60 per month; $ 64.80 per lease term; Other NONE          $ 64.80
(identify each charge and amount and then give aggregate total in right column)
The monthly payment includes money with which to pay said fees and taxes.

9. INSURANCE—Lessee agrees to provide insurance coverage of the following types in the following amounts: actual cash value fire and theft insurance coverage with loss payable to CLN Lessee elects to provide said coverage in the following manner:
☐ under Lessee's existing insurance policy issued by the following named insurance company or agent:

NAME          ADDRESS          POLICY NO
☐ Lessee authorizes Lessor to obtain for Lessee said insurance coverage for the TERM of this LEASE for a total premium cost of          $ 32.22
The monthly payment includes money with which to pay this.

10. MAINTENANCE: Lessee is responsible for the following maintenance of the leased property: Lessee shall, at all time, keep and maintain said property in good order and operating condition, as originally intended, and shall not alter or change the property. Lessee promises only to use replacement parts manufactured by the manufacturer of said property and all such replacement parts shall become a part of the property and the property of CLN. Lessee promises to pay all monthly payments promptly when due; notwithstanding said property may not be in operating condition or useful to Lessee. **Lessor shall not have any responsibility for any maintenance.**

11. WARRANTIES: The leased property is subject to the following express warranties, if any; ·.

☑ **NONE by CLN. CLN LEASES THE PROPERTY IN ITS "AS IS CONDITION", "WITH ALL FAULTS", and "WITHOUT WARRANTIES OR REPRESENTATIONS, EITHER ACTUAL OR IMPLIED IN LAW, OF ANY KIND OR CHARACTER".**

☐ Manufacturer's standard warranty as to said property is assigned by CLN to Lessee and Lessee has the right at Lessee's cost and expense to enforce said warranty if need be. **CLN DOES NOT GUARANTEE PERFORMANCE BY THE MANUFACTURER.**

☐ NONE by AGENT

☐ The Agent as disclosed above for itself only (and not for CLN) does hereby make, as to said property, the following limited warranties: _____

12. EARLY TERMINATION AND DEFAULT:
(a) Lessee may terminate this lease before the end of the lease term upon the following conditions: Upon notice to CLN and delivery and surrendering to CLN the property in as good a condition as Lessee received same, less ordinary wear and tear. The charge for such early termination is the payment of all the lease payments and late payment charges which have matured prior to delivery of said property to CLN and paying for all damage to said property other than the ordinary wear and tear, and all return premiums from any insurance which Lessor obtains for Lessee as authorized herein.
(b) CLN may terminate this lease before the end of the lease term upon the following conditions: Should Lessee fail to make any monthly payment promptly when due, or without CLN's permission move the property from the agreed location, or if property is not being maintained as Lessee has contracted, or Lessee is abusing or misusing the property, or Lessee fails to otherwise perform Lessee's obligations under this Lease Agreement. Upon such early termination, CLN shall be entitled to receive from Lessee all lease payments which have matured prior to the date of said termination, plus a sum to cover all damages to the property other than ordinary wear and tear, plus all late payment charges, and a reasonable attorney's fee, and all return premiums from the insurance which the lessor is authorized herein to obtain for the lessee. Date of termination shall be the day CLN regains possession of said property with the unrestricted right to dispose of same free of any claim thereto by Lessee.
(c) Upon early termination of said lease pursuant to paragraphs (a) or (b) above, CLN is authorized, with or without legal process, to enter any premises wherein the property may be found and take possession thereof, with or without notice to Lessee, and without liability to Lessee for such entry.

13. LATE PAYMENTS: The charge for late payments is that sum necessary to cover the cost and expenses of handling late payments but not to exceed $__5.00__, per payment, plus a sum, if CLN is required to send its representative to collect said payment, to cover that additional cost but not to exceed $__10.00__, making a possible total late payment charge of $__15.00__.

14. OPTION TO PURCHASE: Lessee has an option to purchase the property at any time during the lease term at an option price computed as of the monthly payment due date following the date of purchase. Before the option can be exercised to purchase the property at the option price, Lessee must pay all matured monthly payments and late payment charges in full. If the right to purchase is exercised at the end of the term, the option price shall be $__200.00__ If the right to purchase is elected prior to the end of the lease term, the option price on the date of execution hereof shall be $424.47 (original option price) and on each monthly payment due date hereafter, said original option price shall decrease by the sum of $__3.20__. Any monthly payment which has been deferred, must be paid in full prior to the property being purchased. Option price includes sales tax.

15. DEFERRAL CHARGE: Upon Lessee's request and CLN's approval, a monthly payment and all subsequent payments may be deferred for a period of 1 month, upon payment to the CLN of a sum not to exceed $__20.00__ to cover costs in handling the deferral. Said deferral charge shall not be applied to any monthly payment, nor to any part of the option price.

16. REVERSE SIDE AGREEMENT: Lessee acknowledges that the terms, conditions and provisions on the reverse side hereof are a part of this lease.

17. RECEIPT ACKNOWLEDGMENT: Lessee, by signing, acknowledges receipt of a completed copy of the foregoing Lease Agreement. Executed this the __15th__ day of __MAY__, 19 __85__.

CONSUMER LEASE NETWORK, INC.,LESSOR                        LESSEE _____

BY __APPLIANCE SALES CENTER__ ,AGENT

BY _____
  (Signature)                      (Title)

18. OWNERSHIP OF PROPERTY: CLN is the owner of the property and Lessee has no rights therein except as provided herein.

19. LOCATION OF LEASED PROPERTY: Lessee shall keep and use the property at the address shown herein for Lessee and shall not be removed from said location without the expressed written permission of the CLN.

20. RIGHT OF ASSIGNMENT: Lessee has no right to sell, transfer, assign, sub-lease or any way encumber the property or Lessee's rights hereunder.

21. PAYMENT AND PERFORMANCE PROMISE: Lessee promises, without notice or demand, to pay all lease payments and perform all other obligations hereunder to CLN at its address set out above. Lessee and Lessees' sureties and guarantors, hereby severally waive presentment for payment, notice of protest, protest of this obligation and diligence in bringing suit against any party hereto and all of said parties consent that the time of payment may be extended for time to time, either before or after maturity, without notice to them and further consent that all or any part of the leased property may be released without their approval and without notice to them.

22. TERMINATION—PROPERTY RETURN: Upon expiration of this lease, either by time, forfeiture, or Lessee's election of early termination, Lessee promises to deliver the property to CLN in good order and running condition, ordinary wear and tear excepted.

23. ATTORNEYS' FEES AND COSTS: Lessee promises to pay a reasonable attorneys' fee incurred by CLN in the enforcement of any rights hereunder and/or in protecting and repossessing the property.

24. INDEMNITY: Lessee does hereby indemnify and save Lessor, it's Agents, servents and employees harmless from any and all claims, damages, suits and expenses including attorneys' fees, by reason of injury to persons or other property occurring from the use or operation of said property.

25. JOINT AND SEVERAL LIABILITY OF LESSEE: All Lessee(s) herein shall be jointly and severally liable.

26. INSURANCE ASSIGNMENT: Lessee hereby assigns to CLN all returned premiums from the insurance which Lessor is authorized herein to obtain for Lessee.

27. DISCLOSURES: By agreement between CLN and Agent, it is agreed that Agent shall make all disclosures required by Federal Consumer Leasing Act.

28. PLURAL CASE: Lessor and Lessee as used herein shall be construed to be plural when more than one person signs this lease in either capacity.

29. GOVERNING LAW: It is agreed that this lease agreement shall be construed and governed by the laws of the State of Tennessee.

**AGENT'S WARRANTY**

The undersigned Agent hereby delivers the foregoing Lease and represents and warrants to CLN as to said Lease, the following:

1. that the disclosures required by the Federal Consumer Leasing Act have been made to Lessee in the foregoing Lease;
2. that Agent has no interest in the property leased;
3. that Agent has not made promises, warranties, representations, or any other commitment to Lessee which are not stated on the face of said Lease;
4. that said Lease is genuine and is legally enforceable against all parties thereto;
5. that there are no liens or other encumbrances on the property leased thereunder, other than the rights of Lessee as set out in said Lease;
6. that the property leased under said Lease is in the possession of Lessee, and is located at the place as stated in said Lease and is in good working order and condition;
7. that all parties to said Lease, at the time of execution, had capacity to contract and the signatures on said Lease are the genuine signatures of the parties each purports to be;
8. that the Lessee named in said Lease does not have, because of any actions or statements of Agent, any defenses or rights of set-off against payment of any sums as set out in said Lease or any part thereof and does not have any rights with repsect to said property leased that are not disclosed in the face of said Lease;
9. that Lessee has not paid Agent any money, sums and/or property which are not disclosed in Total Payment Due at Inception, as set out in said Lease and delivered in kind herewith to CLN;
10. that Agent has no material adverse knowledge about the Lessee, the Lease, or the leased property not disclosed to CLN;
11. that upon breach of any of the warranties herein, the Agent promises to pay to said CLN all loss, cost and expense including attorneys' fees incurred by CLN in connection with such breach and/or enforcing this warranty; and in the event of any such breach, Agent promises and agrees to purchase from CLN said Lease for an amount then equal to Lessee's option price of the property as set out in said Lease, plus CLN's loss, cost, and expenses including attorneys' fees as above provided;
12. that in the event Lessee defaults under a lease during the original scheduled term of said lease, and CLN repossesses the personal property which is the subject of said lease, Agent shall, upon demand, repurchase from CLN said repossessed personal property for the then amortized unit cost depreciation balance of said property; provided the property is tendered to Agent within one-hundred-twenty (120) days after maturity of the earliest payment still wholly in default; but if repossession of said property is prevented by bankruptcy of Lessee, or some Governmental action or if it is necessary to resort to the Courts to obtain possession of said property, then said 120 day period shall not commence to run until the order of said Bankruptcy Court, Governmental agency or Court allowing CLN to take possession of said property becomes final;
13. that all insurance premium refunds and other credits shall be applied first to the earliest payment in default;
14. that all proceeds from the Lease are the property of CLN and any checks, money orders and other similar items received by CLN as payment on or in connection with a Lease, containing the name of Agent may be endorsed for and on behalf of Agent by CLN and the proceeds applied to the appropriate Lease;
15. that the money, sums and/or property delivered to CLN herewith are described as follows:

money (cash) $ _156 79_

other sums _____
(describe - if none, so state)

property _____
(describe - if none, so state)

This _15_ day of _May_ ,19 _84_

AGENT _Appleton Sales Co._

by _Marguerite Dwight_
(Signature)                    (Title)

## APPENDIX B

### CLM APPLICATION

Date | State | Class | App#
Builder | Reason
Dealer | Salesman | Phone
First | MI
Last

**Credit/Bank References**

Name | Phone
Address
City | State
Zip | Phone
W/Call
SS#
Age | #Dep
O/R/B | Years
Llord
Phone | Rent $
Address
Address
O/R | Years
Emp
Phone
Supr
Addr | Income $
Position | Years

**Personal References**

Name/Relationship | Phone/Address

**Miscellaneous**

Off Inc
Amount $
Pre/Emp
Phone
Year
Auto Y
Make
Finance
Phone
Dr Lic
Ins Agent
Phone
Add/Pol
Exp

**Co-Applicant**

Co-Apt
Phone | Rel
SS#
Address
Y of I | Age
Employer
Phone
Supr | Income $
Position | Years

Comment
Block

**Lease Information (Office Use Only)**

| COGS | Retail | Tax | Total | St | Trm | Type | Ins | Dep | Product Description |
|------|--------|-----|-------|----|----|------|-----|-----|---------------------|
| $ | $ | $ | $ | | | | | | |
| $ | $ | $ | $ | | | | | | |

