In re Donny E. BARNHILL and Cynthia A. Barnhill, Debtors.

Bankruptcy No. 92–73768.

United States Bankruptcy Court,
D. South Carolina.

Dec. 23, 1992.

James D. Cooper, Jr., Cooper, Coffas and Megna, Columbia, SC, for debtors.

Terrell T. Horne, Bryan, Bahnmuller, King, Goldman and McElveen, Sumter, SC, for creditor.

## MEMORANDUM AND ORDER

J. BRATTON DAVIS, Chief Judge.

Before the court are the objections of Wink's TV, Inc. d/b/a Curtis–Mathes (Wink's) to: (1) the debtors' Motion to Value Security and (2) the confirmation of the debtors' Second Amended Chapter 13 Plan filed November 9, 1992.[1]

Wink's contends that the hereinafter described transactions, between it and the debtors, are not secured transactions, but are leases which the debtors may assume or reject under 11 U.S.C. § 365.[2]

### FACTS

On May 25, 1992, Cynthia Barnhill and Wink's executed a document entitled South Carolina Rental–Purchase Agreement (the First Agreement) relating to a "Home Entertainment Center." The First Agreement provides for an initial term of one week, for an overall term of 104 weeks, and for Cynthia Barnhill's having the right (by returning the property) to terminate the agreement at any time without incurring further obligation or penalty except for the payments which may have accrued while she had possession of the property.

According to the First Agreement, ownership of the property would be transferred to Cynthia Barnhill (the lessee) after she made the 104 weekly payments. Alternatively, she could purchase the property by paying 55%

---

1. The debtors filed their first plan on July 1, 1992. Wink's filed its Objection to Chapter 13 Plan on August 6, 1992, objecting to the plan on the ground that the agreements between the parties were rental agreements, not secured transactions as the debtors had represented in their plan. A hearing on Wink's objection and a hearing on the confirmation of the plan were held simultaneously on September 1, 1992. At that time, the debtors agreed to amend their plan, and agreed that the amendments would not affect the original treatment of Wink's claim. Although the court, with the consent of the parties, entered an order which provided that the amended plan would be confirmed without further hearing upon the trustee's recommendation, the parties agreed that such confirmation would be subject to the court's disposition of Wink's objection to the valuation of security, which objection, if sustained, would result in the denial of confirmation of the debtors' amended plan.

2. 11 U.S.C. § 365 provides, in relevant part:

Executory contracts and unexpired leases.
(a) Except as provided in § 765 and § 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

of the unpaid scheduled payments. The First Agreement expressly provides that the lessee does not own the property until the scheduled payments have been made. The agreement also states:

Insurance: You (Lessee) are not required to provide or pay for any insurance. We (Lessor) do not provide for any insurance. However, insurance on the rented property may be available through us. Total premium cost: $1.20 per payment.

On December 14, 1991, Cynthia Barnhill and Wink's entered into a second South Carolina Rental–Purchase Agreement (the Second Agreement) covering a stereo. Except for the amount of the payments and the description of the property, the Second Agreement is identical to the First Agreement.

Subsequent to their having obtained relief under Chapter 13 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, the debtors filed a Motion to Value Security, claiming that the "Home Entertainment Center" and the stereo are worth $700. The record supports that claim. Their Second Amended Chapter 13 Plan treats the two agreements as giving Wink's one $700 secured claim, with the balance, if any, of Wink's claim, being unsecured.

The issue is whether the agreements are true leases or are disguised security agreements. Wink's contends that the agreements are not secured transactions, but are true leases which the debtors may assume or reject under 11 U.S.C. § 365.

### DISCUSSION

■ Whether an agreement is a true lease or a disguised security agreement is determined by reference to state law. See, 11 U.S.C. § 101(51); H.Rep. No. 95–595 95th Con., 1st Sess. 314 (1977). The determination "depends primarily upon the intent of the parties." *Compliance Marine, Inc. v. Campbell (In re Merritt Dredging Co.)*, 839 F.2d 203, 208–209 (4th Cir.1988). The parties' characterization of the agreement is not controlling, the court should instead apply an objective standard to the facts of each case to determine "the true relationships and economic realities created by the agreement."

*Merritt Dredging,* 839 F.2d at 209; *In re Simpson Creek Development, Inc.,* 90–03836 (Bankr.D.S.C. August 5, 1992).

S.C.Code Ann. § 36–1–201(37) (Supp.1991) defines a "security interest" as "an interest in personal property or fixtures to secure payment or performance of an obligation", and states that:

Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

■ Under the "economic realities" test, the main factor to be considered in determining whether an agreement is a security agreement or a true lease is whether the debtor has acquired sufficient equity in the property by making payments under the agreements so that at the end of the contractual terms it can reasonably be anticipated that the debtor will exercise the option to pay the nominal consideration necessary to purchase the property. S.C.Code § 36–1–201(37) (Supp.1991); *Merritt Dredging,* 839 F.2d at 210; *In re Simpson Creek Development, Inc., supra; In re Puckett,* 60 B.R. 223 (Bankr.M.D.Tenn.1986) *aff'd* 838 F.2d 471 (6th Cir.1988).

■ The option at the end of the contractual term to purchase the property for nominal consideration is, however, not the only factor to be considered. Other factors are:

Whether the lessee may terminate the agreement without paying a sum certain or without any further obligation. *In re Frady,* 141 B.R. 600 (Bankr.W.D.N.C.1991); *In re Huffman,* 63 B.R. 737 (Bankr. N.D.Ga.1986); *In re Pledger Roy Wood,* 7 B.R. 543 (Bankr.N.D.Ga.1980);

Whether the lessee is obligated to maintain and repair the property. *In re Moreggia & Sons Inc.,* 852 F.2d 1179 (9th Cir.1988); *In re Puckett, supra; In re*

*Brookside Drug Store, Inc.*, 3 B.R. 120 (Bankr.D.Conn.1980);

The total amount of the payments under the agreement as compared to the value of the property. *In re W.B. Easton Construction Co.*, 89–02817 (Bankr.D.S.C. January 19, 1990); *In re Puckett, supra; In re Powers,* 43 B.R. 112 (Bankr.E.D.Mo.1984);

Whether the property has a useful life in excess of the economic value to the lessor. *In re Puckett, supra; In re Celeryvale Transport, Inc.,* 44 B.R. 1007, 1014 (Bankr. E.D.Tenn.1984);

Whether the debtor acquires any equity in the property by making payments under the agreement. *In re W.B. Easton Construction Co., supra; In re Powers, supra;*

Whether the agreement requires the lessee to be responsible for the payment of any taxes, insurance, maintenance, repairs and other charges normally associated with ownership. *In re W.B. Easton Construction Co., supra;*

Whether the lessor is in the business of leasing such equipment. *In re Simpson Creek Development Inc., supra; In re Teel,* 9 B.R. 85 (Bankr.N.D. TX 1980);

Whether the lessee assumes the risk of any loss. *In re Simpson Creek Development, Inc., supra; In re Brower,* 104 B.R. 226 (Bankr.D.N.D.1988); *In re Teel, supra.*

■ "Consumer rental-purchase agreements" are governed by the provisions of S.C.Code Ann. § 37–2–701 *et seq.* (1976). To qualify as a "consumer rental-purchase agreement" the agreement must be for personal property intended for personal or household use, and have an initial term of 4 months or less.[3]

In addition to having those qualifications, the agreements here provide for weekly payments for as long as 104 weeks, however, those payments may be terminated at any time by Cynthia Barnhill without penalty.

■ In South Carolina a lessor, in a consumer rental-purchase agreement, is required to disclose, *inter alia,* that the lessee will own the property (1) by making all scheduled payments, or (2) by paying 55% of the difference between the total of scheduled payments and the total amount paid on the account; and, if applicable, the agreement shall disclose that the lessee is responsible for the fair market value of the property if it is lost, stolen, damaged, or destroyed. S.C.Code Ann. §§ 37–2–702 [4] and 37–2–713 [5] (1976).

A consumer rental-purchase agreement is, by definition, not a consumer credit sale. S.C.Code Ann. § 37–2–701(6) (1976).[6]

Cynthia Barnhill's purchase options, as set forth in the consumer rental purchase agree-

3. Section 37–2–701, in pertinent part, provides:

&#42;   &#42;   &#42;

(6) "Consumer rental-purchase agreement" means an agreement for the use of personal property by an individual primarily for personal, family or household purposes, for an initial period of four months or less (whether or not there is any obligation beyond the initial period) that is automatically renewable with each payment and that permits the consumer to become the owner of the property. The term does not include a consumer credit sale as defined in § 37–2–104, or a consumer loan as defined in § 37–3–104, or a refinancing or consolidation thereof, or a consumer lease as defined in § 37–2–106.

4. Section 37–2–702 provides:

(1) In a consumer rental-purchase agreement, the lessor shall disclose the following items, as applicable:

&#42;   &#42;   &#42;

(e) If applicable, a statement that the lessee is responsible for the fair market value of the

property if and as of the time it is lost, stolen, damaged, or destroyed.

&#42;   &#42;   &#42;

(g) A statement that at any time after the first periodic payment is made, the lessee may acquire ownership of the property by tendering fifty-five percent of the difference between the total of scheduled payments and the total amount paid on the account.

5. Section 37–2–713 provides:

In a consumer rental-purchase agreement, at any time after the lessee has made the first periodic payment, the lessee may:

(1) return the rented property to the lessor

(2) continue making periodic payments or renewals as provided for in the agreement for the remaining term of the agreement, or

(3) purchase the property by tendering fifty-five percent of the difference between the total of scheduled payments and the total amount paid on the account.

6. See n. 3.

ments, comport with the language of S.C.Code Ann. § 37–2–713. The statement in the agreements of her liability for the fair market value of the property in the event of loss, theft, damage in excess of normal wear and tear, or destruction are mandated by S.C.Code Ann. § 37–2–702(e) (1976).[7]

Bankruptcy courts in other jurisdictions, when considering the issue currently before this court and when applying state law similar to that of South Carolina to facts analogous to those here, have held that such consumer rental-purchase agreements, also known as "rent-to-own" contracts, are split as to whether *vel non* such agreements are true leases merely because the lessee is entitled to terminate the lease at any time without further obligation or penalty.[8]

■ Wink's would have this court hold that merely because an agreement is a consumer rental-purchase agreement as defined in Section 37–2–701, the agreement should be considered a true lease regardless of the other aspects of the agreement. In order to accept Wink's argument, this court must ignore S.C.Code Ann. 36–1–201(37) (Supp.1991) and much state and federal case law.

Wink's position is incompatible with the wording of S.C.Code Ann. § 36–1–104 (1976) which states:

This act being a general act intended as a unified coverage of its subject matter, no part of it shall be deemed to be impliedly repealed by subsequent legislation if such construction can reasonably be avoided.

Furthermore, S.C.Code Ann. § 37–1–103 (1976) states:

Unless displaced by the particular provisions of this title, the Uniform Commercial Code and the principles of law and equity, including the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or

invalidating cause supplement its provisions.

Neither the South Carolina Consumer Protection Code, nor its Legislative History indicates any specific displacement of S.C.Code § 36–1–201(37) (Supp.1991).

Some courts have held that Rental–Purchase Agreements acts, such as South Carolina's act[9], which are patterned after federal Truth–In–Lending Law provisions contained in Chapter 14 of Title 15 of the United States Code are mainly disclosure statutes and do not change the provisions of the Uniform Commercial Code or existing case law. *In re Shelby, supra; In re Burton, supra; In re Puckett, supra.*

This court is of the opinion that although an agreement is a consumer rental-purchase agreement, such agreement is not necessarily a true lease; the determination of whether a consumer rental-purchase is a security agreement or a true lease should be made according to the factors set forth in S.C.Code Ann. 36–1–201(37) (Supp.1991) and existing case law.

Wink's would have this court ignore the language of S.C.Code § 36–1–201(37) (Supp. 1991) as to whether the property may be purchased at the end of the contractual term for no consideration and, instead, focus on whether the debtor may terminate the agreement without further obligation or penalty. This "one factor" test has been rejected by at least four courts. *In re Shelby, supra; In re Burton, supra; In re Aguilar, supra; In re Puckett, supra.* Compare, *In re Frady, supra.*

■ There are several factors persuading this court that the agreements are security agreements: the debtor's assumption of the risk of any loss or damage to the collateral; the debtor's risk of any loss and her responsibility to provide insurance on the property; the total amounts of the payments under the

---

7. See n. 4.

8. *In re Frady*, 141 B.R. 600 (Bankr.W.D.N.C. 1991); *In re Glenn*, 102 B.R. 153 (Bankr. E.D.Ark.1989): *In re Unger*, 95 B.R. 761 (Bankr. D.Oreg.1989): *In re Armstrong*, 84 B.R. 94 (Bankr.W.D.Tex.1988); *In re Huffman*, 63 B.R. 737 (Bankr.N.D.Ga.1986). *But see In re Shelby*,

127 B.R. 682 (Bankr.N.D.Al.1991); *In re Burton*, 128 B.R. 807 (Bankr.N.D.Al.1989) *aff'd.* 128 B.R. 820 (N.D.Al.1989); *In re Aguilar*, 101 B.R. 481 (Bankr.W.D.Tex.1989); *In re Puckett, supra.*

9. See 1974–1975 op. Atty. Gen. of S.C., No. 4208, p. 253.

agreements exceeding the value of the property; the property's having a useful life in excess of the economic value to the lessor; the debtor's equity acquired by her making payments under the security agreements; and, the debtor's right to purchase the property for no additional consideration at the end of the agreements.

### CONCLUSIONS

(1) The agreements are security agreements.

(2) Wink's objection to the motion to value the security should be overruled.

(3) The debtors' Second Amended Chapter 13 Plan, filed November 9, 1992, should be confirmed.[10]

### ORDER

AND IT IS SO *ORDERED.*