In re Ginger Kay SMITH, for Debtors.

No. CIV. A. 00–06071–W.

United States Bankruptcy Court,
D. South Carolina.

Nov. 27, 2000.

Seann A. Gray, Greenville, SC, John A. Pincelli, Columbia, SC, Dalton H. Watkins, Columbia, SC, for creditor.

Lola Stratford Richey, Greenville, SC, for debtor.

## ORDER

JOHN E. WAITES, Bankruptcy Judge.

THIS MATTER comes before the Court upon the Objection to and Motion for Denial of Confirmation of Plan and to Valuation (the "Motion") filed by General Motors Acceptance Corporation ("GMAC") on August 7, 2000. GMAC objected to the Chapter 13 Plan filed by Ginger Kay Smith ("Debtor") on the grounds that the GMAC SmartLease Agreement entered into between Debtor and GMAC on or about February 24, 1999, was a true lease, as opposed to a disguised security agreement, which could only be assumed or rejected. At the hearing on the Motion, Debtor responded by arguing that the agreement in question was a disguised security agreement which could be valued and modified under the Chapter 13 Plan. After considering the pleadings in the matter, all the evidence presented, and the arguments of counsel at the hearing on the Motion; the Court makes the following Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52, made applicable in bankruptcy proceedings by Fed. R. Bankr.P. 7052.[1]

---

1. The Court notes that to the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to

## FINDINGS OF FACT

1. On or about February 24, 1999, Debtor executed a document captioned "GMAC SmartLease Agreement" (the "Agreement"), whereby GMAC leased a 1999 Saturn to Debtor upon the terms and payments set forth in the Agreement. The Agreement shows Saturn of Greenville as being the "Lessor" and Debtor as the "Lessee." However, the Agreement specifies that the Lessor assigned the Agreement and sold the vehicle to GMAC. As the evidence at the hearing on the Motion reflected, GMAC is the present beneficial owner of the car and GMAC paid Saturn of Greenville the acquisition cost of the vehicle. GMAC, as assignee, was to receive Debtor's monthly payments pursuant to the Agreement.

2. The agreed upon value of the vehicle as evidenced in the Agreement was $14,540.

3. Debtor paid the sum of $1,000 at the time the Agreement was signed.[2] Pursuant to the Agreement, Debtor was required to make 47 payments of $279.64 each. The total of the monthly payments at the end of the four-year term would have been $13,422.72.

4. The Agreement provided for a purchase option at the end of the term, whereby Debtor could buy the vehicle for $6,397.60, plus official fees and taxes. That amount represents the projected residual value of the vehicle.

5. According to the language of the Agreement, if the purchase option was not exercised at lease end, Debtor had the alternative option to return the vehicle to GMAC. If Debtor chose not to exercise the option and rather returned the vehicle, she would only owe GMAC for excess mileage, if any, and for any estimated or actual cost of repairing excess wear.

6. Pursuant to the Agreement, early termination by Debtor was permitted; however, the language of the contract provided: "You may have to pay a substantial charge if you end this lease early. *The charge may be up to several thousand dollars.* The actual charge will depend on when the lease is terminated. The earlier you end the lease, the greater this charge is likely to be."

7. Debtor is required by the terms of the Agreement to maintain insurance,[3] pay taxes,[4] and pay for the maintenance of the vehicle.[5] At the hearing, Mr. Benister,

the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

2. The $1,000 down payment included $720.36, representing the trade-in value of Debtor's 1987 Toyota Ter Deluxe, and the first monthly payment in the amount of $279.64.

3. The Agreement provides:
You must insure the vehicle through liability and physical damage policies acceptable to us. . . .
Liability insurance must (a) cover up to $50,000 for property damages, $100,000 for bodily injuries to any one person, and $300,000 for bodily injuries for any one accident, or (b) have a combined single limit of $300,000 for bodily injuries and property damage for any one accident.
Physical damage insurance must have deductibles of no more than $500 for collision and upset loss and $500 for comprehensive fire and theft loss.

4. Under the caption "Official Fees and Taxes," the Agreement provides:

You will pay all government license, title, registration, testing, and inspection fees for the vehicle. You will pay all taxes on the lease or the vehicle that the government levies on you, the vehicle or us (except our net income taxes). We may change your monthly payment if taxes change. We may bill you separately for official fees and taxes.

5. Debtor has the obligation to "maintain and repair the vehicle to keep it in good condition." The Agreement further provides:

When you take possession of the vehicle, you take on the risks of loss of the vehicle and of damage to it. If the vehicle is damaged, stolen, or destroyed and money becomes available from insurance, a judgment, a settlement, or the like, we will treat the money as an insurance settlement. We and/or Vehicle Asset Universal Leasing Trust will be entitled to this money. If the lease ends in connection with our receipt of the money, we will treat the money as sale proceeds.

who is employed by GMAC as Operations Manager and oversees the administration and collection of all retail and leasing accounts, testified that the requirements that Debtor pay for taxes, insurance, and maintenance of the vehicle are included in the Agreement because the amounts of such obligations vary over the term of the Agreement and cannot be easily pre-determined. However, he testified that at the request of the customers; GMAC would pay for insurance and taxes on the vehicle, subject to being reimbursed by the customer.

8. Title to the vehicle was not in Debtor's name; rather, the Certificate of Title reflects "Vault % Smith Ginger K" as the owner of the 1999 Saturn. At the hearing, Mr. Benister explained that Vault is a subsidiary of GMAC.

9. The Agreement expressly prohibits the subleasing or transfer of any rights or interest in the vehicle by Debtor, without prior written consent. Furthermore, by signing the Agreement, Debtor promised to "keep the vehicle free of liens unless [GMAC] agree[s] to them."

10. Mr. Benister testified at the hearing that GMAC engages in both the leasing and retail financing of vehicles and trucks. He further explained some of the main differences between their "lease" agreements, such as the one presently before the Court, and their purchase money contracts, which they also offer to customers. Mr. Benister explained that while, pursuant to GMAC SmartLease Agreements, the lessee cannot place a lien on the vehicle, the buyers can do so under a GMAC's purchase money contract. Similarly, while lessees under a GMAC's SmartLease Agreement are not allowed to move their vehicles to another state absent notification to the lessor, such practice is allowed for parties to a purchase money contract.

11. Debtors filed for relief under Chapter 13 of the United States Bankruptcy Code on July 14, 2000.

12. On August 1, 2000, Debtor filed a Chapter 13 Plan which provides for the following treatment of the GMAC's Agreement:

Secured debt—Payments of $282.00 or more per month, to GMAC until the value of lien plus 10% interest has been paid in full. If lien is to be valued, the debtor hereby moves to value the lien at $11,000.00 in accordance with SC LBR 3015-1 and the notice attached hereto. The basis of the debtor's value is as follows: The fair market value of the 1999 Saturn SC-1 Coupe is less than the balance owed due to its age, mileage and repair status.

Debtor did not move for either the assumption or rejection of any leases under the Plan.

13. On August 7, 2000, GMAC filed the Motion presently before the Court, arguing that the GMAC SmartLease Agreement is indeed a true lease and that unless Debtor's proposed Plan is amended to provide for the assumption of the lease, confirmation of the Plan should be denied. Furthermore, GMAC argues that inasmuch as Debtor owns no interest in the vehicle, her motion to value the collateral should be denied. Lastly, GMAC raises the issue as to the proper procedure for bringing such determinations of interest in property before the Court.

## CONCLUSIONS OF LAW

The main issue presently before the Court is whether the Agreement between GMAC and Debtor is a true lease or a disguised security agreement. GMAC contends that the Agreement in question is a true lease which cannot be modified by the Plan and that, unless Debtor's proposed Plan is amended to provide for the assumption of the Agreement, confirmation of the Chapter 13 Plan should be denied.

■ In the Motion, GMAC also raises a procedural issue and argues that Debtor cannot attempt to value the vehicle in

question given the fact that such a determination must be accomplished by the procedures set forth in Fed. R. Bankr.P. 7001. Subsection 2 of the Fed. R. Bankr.P. 7001 provides that "a proceeding to determine the validity, priority, or extent of a lien or other interest in property" should be brought through an adversary proceedings. This Court as well as courts in other jurisdictions, have always treated issues concerning whether an agreement is a true lease or disguised security agreement as contested matters, rather than adversary proceedings. While the determination of the issue of whether an agreement is a lease as opposed to a sale has a definite impact on a creditor's lien; it cannot be said that it should procedurally be treated as an adversary proceeding governed by Fed. R. Bankr.P. 7001 and SC LBR 6004–1(e). *See, e.g., In re Beard,* 112 B.R. 951, 955 (Bankr.N.D.Ind.1990) ("Objections to the allowance of a claim and the determination of secured status are contested matters. The issues they raise do not require an adversary proceeding.... Both issues, however, will have a decided impact upon the creditor's lien."). Therefore, the Court finds that the issue is procedurally proper before this Court.

■ The Court notes that the determination of whether a transaction is a lease or a security interest is a matter of state law. *See, e.g. South Carolina Rentals, Inc. v. Arthur,* 187 B.R. 502, 504 (D.S.C.1995) ("State law determines whether or not an agreement is a true lease or a disguised security agreement under the Bankruptcy Code."); *In re Architectural Millwork,* 226 B.R. 551, 553 (Bankr.W.D.Va.1998); *In re Yarbrough,* 211 B.R. 654, 656 (Bankr.W.D.Tenn.1997); *In re Barnhill,* 189 B.R. 611, 613 (Bankr. D.S.C.1992). Given the fact that the Agreement was entered into in South Carolina, and further considering that South Carolina has an interest in the transaction at issue and that both Lessor and Lessee are located in South Carolina; the Court finds that the laws of this state should

govern the Court's determination of whether the Agreement is a true lease or disguised security agreement.

■ S.C.Code Ann. § 36–1–201(37) defines "security interest" and provides within that definition a test to differentiate true security agreements from leases. The section provides in pertinent part:

Whether a lease is intended as security is to be determined by the facts of each case; however (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

The Fourth Circuit has interpreted this section of the South Carolina Commercial Code as giving weight to the intent of the parties involved in determining whether the transaction was to be treated as a security agreement or a lease. *See Compliance Marine, Inc. v. Campbell (In re Merritt Dredging Co., Inc.),* 839 F.2d 203, 209 (1988) ("Whether a putative lease actually represents a security agreement depends primarily upon the intent of the parties. S.C.Code Ann. § 36–1–201(37). The intent of the parties must be measured by the application of an objective standard to the facts of each case."); *see also In re Mandrell,* 246 B.R. 528, 531 (Bankr.D.S.C.1999); *South Carolina Rentals, Inc. v. Arthur,* 187 B.R. 502, 504 (D.S.C.1995); *In re Barnhill,* 189 B.R. 611, 613 (Bankr.D.S.C.1992); *In re Fleet Management Servs. Inc.,* C/A No. 99–05760–W (Bankr.D.S.C.1999).

■ In this case, the Agreement between Debtor and GMAC is styled "GMAC SmartLease Agreement" and it is referred to throughout the document as a "Lease" and the parties as "Lessor" and "Lessee." Despite the fact that the Agreement itself contains language which implies that it is a lease, such labels are not conclusive *per se,*

even though they are helpful in determining the nature of the transaction between the parties. *See, e.g. In re Merritt Dredging Co., Inc.*, 839 F.2d at 209 ("The parties' characterization of the charter party as a lease is not controlling."); *see also In re Winston,* 181 B.R. 589, 590 (Bankr. N.D.Ala.1995). Rather than looking to the labels attached to an agreement as sole evidence of the nature of the transaction, the Fourth Circuit concluded that courts should look to " 'the true relationship and economic realities created by the agreement' to determine the interests conveyed by it." *In re Merritt Dredging Co., Inc.*, 839 F.2d at 209 (quoting *Sight & Sound of Ohio, Inc. v. Wright,* 36 B.R. 885, 889 (S.D.Ohio 1983)).

When applying the "economic realities" test in making a determination whether the transaction represents a sale or a true lease, this Court has previously relied upon a list of nine factors. *See, e.g. In re Mandrell,* 246 B.R. at 530; *In re Barnhill,* 189 B.R. at 613–14; *In re Carter,* C/A No. 99–7461–D (Bankr.D.S.C.11/15/1999); *In re Fleet Management Servs. Inc.,* C/A No. 99–05760–W (Bankr.D.S.C.1999). Recently, the issue of whether an agreement involving a vehicle should be viewed as a lease or a disguised security agreement has been argued more and more often before this Court. Therefore, the Court is inclined to review the precedent and better define the analysis to be followed in making a determination in cases dealing with the "lease" of vehicles, especially in agreements which only extend over a term of a few years. While the factors to be applied are essentially the same as the ones previously employed, the Court recognizes that some prongs to the "economic realities" test outlined in *In re Barnhill* could be combined and some are impracticable in agreements, such as the one presently before the Court, which have a short term.[6]

Furthermore, the Court adds a new factor to the previous list provided in *In re Barnhill,* which is one of the pivotal factors to consider in cases dealing with vehicles or collateral that requires the recording of title with a state agency.

■ Therefore, in making a determination of whether the Agreement in this case was a true lease, as GMAC claims, the Court will apply the following six factors:

1. Whether the debtor has acquired sufficient equity in the vehicle by making payments under the agreement so that at the end of the contractual term it can reasonably be anticipated that the debtor will exercise the option to pay the nominal consideration necessary to purchase the vehicle.

2. Whether the title to the vehicle is in the debtor's name, so that the debtor can exercise rights of ownership such as selling, trading, or encumbering the vehicle.

3. Whether the debtor may terminate the agreement without paying a sum certain or without any further obligation.

4. Whether the debtor is obligated to maintain and repair, insure, or pay taxes on the vehicle.

5. [Whether] [t]he total amount of the payments under the agreement [exceeds] the value of the vehicle.

6. Whether the creditor is in the business of leasing vehicles.

■ The Court has traditionally recognized the first of these factors as the most important prong of the analysis, and it is also the one factor that the South Carolina Commercial Code relies on in order to determine if an agreement falls within the definition of "security interest". *See, e.g. In re Barnhill,* 189 B.R. 611, 613

---

6. For example, the factor dealing with "[w]hether the property has a useful life in excess of the economic value to the lessor" is irrelevant in agreements, such as the one presently at issue. In fact, agreements for the "lease" of an automobile usually extend over a term of less than five years, a substantially shorter period than what is generally attributed to the useful life of any one vehicle.

(Bankr.D.S.C.1992) (defining that factor as "the main factor to be considered in determining whether an agreement is a security agreement or a true lease."); *see also* S.C.Code Ann. § 36–1–201(37). However, the Court recognizes the importance of the other factors as well and further examines the intent of the parties at the time they entered into the agreement. When examining the intent of the parties in the case of an agreement concerning a vehicle, the Court gives particular attention to the person or entity in whose name the collateral is titled and their ability to exercise ownership rights, such as selling, trading, or encumbering the car during the term of the agreement. In this case, the application of all these factors indicates that the Agreement in question is a true lease.

One of the critical factors for the Court to consider is in whose name the vehicle is titled. Unlike the case of rent-to-own agreements dealing with appliances, such as the case in *In re Barnhill*, vehicles are titled in either individuals or an entity's name, and such title is recorded with a state agency. The ability to sell, trade, or encumber the vehicle is contingent on having title. Thus, the first indicator of the parties' intent of whether a transaction is a true lease or a disguised sale is the disposition of the vehicle's title. In the case of In re Mandrell, 246 B.R. 528, 531 (Bankr. D.S.C.1999), this Court has previously emphasized the importance of the title in "SmartBuy" agreements. The Court placed emphasis on the three following factors, among the other factors listed in *In re Barnhill*: " 'the car [was] titled in the name of the debtor; the debtor pa[id] taxes on the car; the debtor [bore] the risk of loss or damage and [was] required to insure the car.' " *In re Mandrell*, 246 B.R. 528, 531 (Bankr.D.S.C.1999) (quoting *In re Johnson*, C/A No. 94–71254–B (Bankr.D.S.C.9/14/1994)). In that case, the car was titled in the debtor's name, who was provided with the following five choices: (1) trade the vehicle and pay off the remaining balance; (2) sell the vehicle and pay off the remaining balance; (3)

keep the vehicle by making the balloon payment specified in the agreement; (4) keep the vehicle and refinance the remaining balance; or (5) surrender the vehicle in satisfaction of the final balloon payment. The agreement did not state that the options could only be exercised at the end of the term; rather, during the term of the contract, the buyer retained the ownership rights to the vehicle and could exercise the options to sell it or trade it in, even prior to the end of the term, as long as the balance due was paid off. The Court in *In re Mandrell* held that the agreement was a disguised security agreement.

█ " 'In order to be viewed as creating a security interest, the lease agreement must provide the lessee with some ownership of the leased property.' " *Id.* (quoting *Sharer v. Creative Leasing, Inc.,* 612 So.2d 1191, 1194 (Ala.1993)). In this case, unlike *In re Mandrell*, Debtor only has the right to use the vehicle which is owned by GMAC. In fact, the Certificate of Title specifies the owner as: "Vault % Smith Ginger K." *See, e.g. In re Carter,* C/A No. 99–7461–D (Bankr. D.S.C.11/15/1999). The issue of ownership of the vehicle is a very important distinguishing factor from *In re Mandrell*, as demonstrated by other precedent in this Court. *See, e.g.,* C/A No. 99–7461–D (Bankr.D.S.C.11/15/1999). In this case, despite the obligations specified in the Agreement to repair, insure, and pay taxes on the vehicle; upon termination of the contract, Debtor has two options: to either purchase the vehicle for its residual value or return it to GMAC. The Agreement does not otherwise provide for Debtor to sell the vehicle because it "does not ... contemplate or provide for [ ] Debtor to acquire any ownership interest in the automobile." *In re Winston,* 181 B.R. at 594.

█ The other pivotal factor, which incorporates the requirement emphasized in S.C.Code Ann. § 36–1–201(37), implies that a security interest is created if the parties' contract allows the "lessee" to be-

come the owner of the property in question for no additional consideration or for nominal consideration. Courts have interpreted "nominal consideration" to refer to an amount small enough that it cannot possibly represent the fair market value of the property at issue. *See, e.g. In re Owen,* 221 B.R. 56, 61 (Bankr.N.D.N.Y. 1998); *In re Winston,* 181 B.R. 589, 592 (Bankr.N.D.Ala.1995).

> "The courts, in referring to the term 'nominal,' frequently use it interchangeably with the sum of one dollar or some other piddling amount; but the real yardstick in determining whether the option price is nominal or substantial would appear to hinge on whether that price bears a resemblance to the fair market price of the article."

*In re Winston,* 181 B.R. at 592 (quoting *In re Universal Medical Servs., Inc.,* 8 U.C.C. Rep. Serv. 614, 1970 WL 12640 (Bankr. E.D.Pa.1970)). In this case, although the Court refrains from drawing a bright-line rule as to what constitutes nominal consideration, it finds that $6,397.60, when considering that the value of the vehicle on the date of the Agreement was entered into was estimated at $14,540.00, does not constitute nominal consideration. Furthermore, given the fact that Debtor can only exercise her option to purchase the vehicle at the end of the "lease" term, as opposed to having the option to sell it during the term, by paying the expected value of the vehicle after three years; it is fair to conclude that Debtor was not expected to acquire equity in the vehicle by making the regular payments due under the Agreement. Lastly, because of the substantial sum due in order to exercise the option to purchase, it cannot be reasonably anticipated that Debtor will exercise such option.[7] *See, e.g. In re Architectural Millwork,* 226 B.R. 551, 555 (Bankr. W.D.Va.1998) (concluding that $9,625.00

did not qualify as non-minimal consideration because it was the fair estimate of the vehicles' value at lease term and noting that "[n]or is it clear that the only economically sensible course for the debtor would be to exercise the option to purchase the vehicle."); *see also In re Carter,* C/A No. 99–7461–D (Bankr.D.S.C.11/15/1999) ("[T]he residual value of $13,192.65—which the debtor must pay at the end of the lease term if she wishes to purchase the vehicle—is more than half of the agreed value of the vehicle ($25,367) at the start of the lease. Clearly that is not 'a nominal consideration.' ").

As to the other factors, the Court finds that the fifth factor also weighs in favor of finding that the Agreement is a lease. According to that factor, the Court should analyze whether Debtor is required, under the Agreement, "to make aggregate rental payments having a present value equaling or exceeding the purchase price of the property." *In re Owen,* 221 B.R. 56, 62 (Bankr.N.D.N.Y.1998); *see also In re Barnhill,* 189 B.R. 611 (Bankr.D.S.C.1992) (citing *In re W.B. Easton Constr. Co.,* C/A No. 89–02817 (Bankr.D.S.C.1/19/1990)). In considering whether the aggregate payments under an agreement exceed the cost of the property, thus indicating that the transaction was in fact a sale, courts have acknowledged that

> [t]he rationale behind this ... factor is that if the alleged lessee is obligated to pay the lessor a sum equal to or greater than the full purchase price of the leased goods plus an interest charge over the term of the alleged lease agreement, a sale is likely to have been intended since what the lessor will receive is more than a payment for the use of the leased goods and loss of their value; the lessor will receive a consideration that would

---

7. While, as the court in *In re Architectural Millwork,* 226 B.R. 551, 557 (Bankr.W.D.Va. 1998) recognized, "[D]ebtor in this case theoretically has the opportunity to build up equity in the vehicle if its value can be maintained

over the lease term at an amount higher than the [ ] option price," the figures which were indicated in the Agreement do not expect any equity to actually accrue during the term of the contract.

amount to a return on its investment.[8] *In re Owen,* 221 B.R. 56, 62 (Bankr. N.D.N.Y.1998) (quoting *In re Edison Bros. Stores, Inc.,* 207 B.R. 801, 814 (Bankr. D.Del.1997)); *see also In re Arthur,* 1993 WL 812531 (Bankr.D.S.C.1993) (concluding that the agreement was a security agreement and, among other factors, considering that in the case, "[t]he rental payments [were] equivalent to the cost of goods plus substantial interest. In fact, the total of payments [were] a multiple of retail value rather than being a value based on the cost of goods plus expected depreciation or the value of the merchandise at the end of the lease."). In this case, the Agreement specifies that the total of the monthly payments that will have been paid at the end of the term is $13,422.72. Of that amount, $8,344.54 is considered the depreciation amount which is the price charged for the vehicle's decline in value through normal use and for other items paid over the lease term; the remaining $5,078.18 represents the rent charge, the amount charged in addition to the depreciation.[9] In this case, the figures demonstrate that payments under the Agreement are less than the fair value of the vehicle; thus indicating that the transaction was intended to be a true lease, rather than a sale.

Another factor that weighs in favor of finding that the Agreement was intended as a lease is the fact that GMAC is in the business of leasing vehicles. GMAC is engaged in the business of both financing and leasing cars and trucks. At the hearing, Mr. Benister testified that GMAC introduced leasing in the late 1970s and that the GMAC SmartLease Agreement presently before the Court was first introduced in October of 1997. The customers have the option to either enter into a lease agreement, whereby they have no ownership rights in the collateral until their option to purchase is exercised at lease end, or to purchase the vehicle outright and finance it through GMAC. Mr. Benister explained that the options that their customers have to either lease or finance the vehicle gives them different rights. While, pursuant to a SmartLease Agreement the lessee cannot place a lien on the vehicle, buyers pursuant to a GMAC's purchase money contract are allowed to do so. Similarly, while lessees under a SmartLease Agreement are not allowed to permanently move their vehicle out of state absent notification to GMAC, such out-of-state moves are allowed under a purchase money contract. The testimony demonstrates that GMAC is in the regular business of leasing vehicles.

■ The remaining two factors, numbered three and four, weigh in favor of finding that the Agreement was a disguised security agreement. However, while the Court should consider who has the duty to maintain, repair, insure, and pay taxes on the vehicle, it cannot be said that a transaction creates a security interest solely due to the fact that the "lessee" assumes such risks and duties. *See, e.g. In re Winston,* 181 B.R. 589, 594 (Bankr. N.D.Ala.1995). Those obligations have, in fact, become a standard in any kind of Agreement entered with car finance companies, whether they were intended as a lease or sale.

The case of *In re Carter,* C/A No. 99–7461–D (Bankr.D.S.C.11/15/1999) presents very similar facts to the case presently before the Court. In that case, General Electric had entered into a "Closed–End

---

8. In making such an analysis, the courts usually compare the "present value" of the payments due under the alleged lease to the fair market value or purchase price of the subject property. The "present value" is usually determined by discounting the amount of the payments to the present date by taking into consideration the interest rate. *See, e.g. In re Owen,* 221 B.R. at 62.

9. In analyzing this factor, the Court notes that at the time of the Confirmation Hearing, the Agreement between the parties had operated for less than 19 months of the 48 months term, a period of very fast depreciation for the vehicle's value.

Motor Vehicle Lease Agreement" with the debtor, whereby the debtor agreed to lease a 1998 Honda Accord and to pay General Electric 48 monthly payments in the amount of $478.75. At lease end, the debtor had the option to purchase the vehicle for the residual value of $13,192.65. In that case, the court ultimately held that the agreement in question was a true lease. In so concluding, the court found that the option to purchase was not for a nominal value, that the total amounts of the payments pursuant to the agreement was not equal to the value of the property, that the debtor did not acquire any equity in the property by making the payments under the agreement, and that the lessor was in the business of leasing vehicles.

In *In re Carter*, the court also emphasized the ownership interest reflected in the Certificate of Title. In that case, the Certificate of Title reflected the owner of the property as "GECAL % Elizabeth L. Carter." The court disagreed with the debtor's contentions that she was the rightful owner of the vehicle and concluded that "a confusing title should not override the parties' intentions unambiguously evinced [sic] in the agreement." *In re Carter*, C/A No. 99–7461–D (Bankr. D.S.C.11/15/1999) (citations omitted); *see also In re Haigler*, 119 B.R. 531, 534 (Bankr.D.S.C.1989) (holding that despite the fact that the title issued by the Highway Department mistakenly listed the name of the vehicle's owner as "FORD MTR CREDIT CO/HAIGLER ROY" instead of using c/o, which would give no ownership rights to the debtor, "[t]he Net (Closed End) Lease, from which the [application for the Certificate of Title] was generated, contains the intentions of the parties .... Therein, [creditor] is the owner and lessor of the vehicle to the debtor, the lessee."). Despite the fact that in *In re Carter* the creditor was held to be the owner of the vehicle, as in the case presently before the Court, the debtor was obligated to pay insurance and taxes on the vehicle. As to that issue, the court concluded:

> The passing of such costs to the debtor is not inconsistent with the conclusion that General Electric is the owner of the vehicle.
>
> Whether General Electric pays the taxes directly and then increases the lease payments to compensate therefor, or requires the debtors to pay the taxes, is of little support to the debtor's contention. The payment of the taxes is a legitimate expense which a lessor may, by agreement, pass on to its lessee. There appears no good reason why General Electric should not, in a true lease, require its lessee to pay the expense of insurance, since it is the lessee who would have possession of the vehicle and who would be in the better position to keep such costs to a minimum.

*Id.* Similarly, in this case the Court finds that the fact that the risk of loss as well as the obligation to maintain the vehicle and pay taxes and insurance on it is not conclusive as to the issue of whether the Agreement is a true lease. The clear intention of the parties was for GMAC to be the owner and lessor of the vehicle until lease end, when Debtor would have the option to purchase the vehicle for the projected residual value at which point ownership would be transferred to her, or to surrender it.

## CONCLUSION

After analyzing the Agreement in question and weighing all of the factors and considering the intent of the parties, the Court finds that the Agreement is a true lease. Presently, Debtor's Chapter 13 Plan treats the Agreement as a security agreement by modifying the payments due under the contract. Upon the Court's determination that the Agreement in question is a lease, the Court sustains GMAC's Objection to Confirmation and allows Debtor to amend her Plan within ten (10) days of this Order. It is therefore;

ORDERED that the GMAC Smart-Lease Agreement is a true lease.

IT IS FURTHER ORDERED that GMAC's Objection to Confirmation of Plan and Valuation is sustained.

IT IS FURTHER ORDERED that Debtor has ten (10) days to amend her Chapter 13 Plan.

**AND IT IS SO ORDERED**.